2002 D.S.D. 13

**SOUTH DAKOTA FARM BUREAU, INC., South Dakota Sheep Growers Association, Inc., Haverhals Feedlot, Inc., Sjovall Feedyard, Inc., Frank D. Brost, Donald Tesch, William A. Aeschlimann, Spear H Ranch, Inc., Marston Holben, Marston and Marion Holben Family Trust, Montana–Dakota Utilities Co., Northwestern Public Service, and Otter Tail Power Company, Plaintiffs,**

**v.**

**Joyce HAZELTINE, in her official capacity as Secretary of State of South Dakota and Mark W. Barnett, in his official capacity as Attorney General of South Dakota, Defendants.**

**Dakota Rural Action and South Dakota Resources Coalition, Defendant–Intervenors.**

**No. CIV. 99–3018.**

United States District Court, D. South Dakota, Central Division.

May 17, 2002.

Richard O. Gregerson, Susan M. Sabers, Woods, Fuller, Shultz & Smith, Sioux Falls, SD, Tomas P. Tonner, Tonner, Tobin & King, Aberdeen, SD, David S. Day, U.S.D. School of Law, Vermillion, SD, David A. Gerdes, Neil K. Fulton, May, Adam, Gerdes & Thompson, Pierre, SD, for Plaintiffs.

Mark W. Barnett, Roxanne Giedd, Lawrence E. Long, Diane M. Best, Attorney General's Office, Pierre, SD, for Defendants.

John H. Davidson, Jr., U.S.D. School of Law, Vermillion, SD, James Jay Tutchton, University of Denver, Denver, CO, Randy Canney, Denver, CO, for Defendant–Intervenors.

MEMORANDUM OPINION

KORNMANN, District Judge.

## INTRODUCTION

[¶ 1] Plaintiffs seek declaratory and injunctive relief, challenging the constitutionality of the 1998 initiated amendments to Article XVII of the South Dakota Constitution, specifically Sections 21 through 24 (known as and hereinafter referred to as "Amendment E" because of its placement on the general election ballot when enacted by the voters of South Dakota). Amendment E in general prohibits limited liability business enterprises from acquiring real estate used for farming and from engaging in farming in South Dakota. Farming includes for the purposes of this action ranching as well. The specific claims are that the amendments are in violation of the United States Constitution, namely the Commerce Clause (more particularly the dormant Commerce Clause), the Equal Protection Clause, the Contracts Clause, the Supremacy Clause, and the Americans With Disabilities Act ("ADA"). This Court has jurisdiction over the subject matter and over the parties. *See* 28 U.S.C. § 1331.

[¶ 2] Being called upon to decide whether certain provisions of the South Dakota Constitution violate the United States Constitution is a heavy burden and one the court does not relish or take lightly. Certain general principles of law must be applied in the necessary analysis. There is a strong presumption of constitutionality as to these provisions. Unless unconstitutional on its face, there must be a clear showing of arbitrariness and irrationality or clear conflict with the United States Constitution. Plaintiffs bear a heavy burden. There are legitimate state interests or purposes in seeking to prevent further concentrations of agricultural land and the production of food and animals from such land, seeking to prevent in the future agricultural land and production of animals and crops from passing into the hands of limited liability entities to the detriment of traditional family farm units and family farm limited liability entities primarily engaged in farming or ranching, and seeking to protect family life and values. South Dakota may make reasonable distinctions between business entities. Limited liability entities exist, if at all, by virtue of state laws permitting the use of such entities. States may decide legitimately to permit no limited liability entities. If Amendment E is susceptible of a reasonable interpretation which supports the constitutionality, the court must accord the measure that meaning. The court is not to adopt a strained, impractical, or absurd result, if possible. Federal judges are not, of course, "super legislatures." Some of these general principles will be discussed later with appropriate references to legal authority.

[¶ 3] § 21 of Article XVII of the South Dakota Constitution provides:

No corporation or syndicate may acquire, or otherwise obtain an interest, whether legal, beneficial, or otherwise, in any real estate used for farming in

this state, or engage in farming. The term, corporation, means any corporation organized under the laws of any state of the United States or any country. The term, syndicate, includes any limited partnership, limited liability partnership, business trust, or limited liability company organized under the laws of any state of the United States or any country. A syndicate does not include general partnerships, except general partnerships in which nonfamily (sic) farm syndicates or nonfamily (sic) farm corporations are partners. The term, farming, means the cultivation of land for the production of agricultural crops, fruit, or other horticultural products, or the ownership, keeping, or feeding of animals for the production of livestock or livestock products.

[¶ 4] § 22 of Article XVII of the South Dakota Constitution provides:

The restrictions in § 21 of Article XVII do not apply to:

(1) A family farm corporation or syndicate. A family farm corporation or syndicate is a corporation or syndicate engaged in farming or the ownership of agricultural land, in which a majority of the partnership interests, shares, stock, or other ownership interests are held by members of a family or a trust created for the benefit of a member of that family. The term, family, means natural persons related to one another within the fourth degree of kinship according to civil law, or their spouses. *At least one of the family members in a family farm corporation or syndicate shall reside on or be actively engaged in the day-to-day labor and management of the farm. Day-to-day labor and management shall require both daily or routine substantial physical exertion and administra-*

*tion.* None of the corporation's or syndicate's partners, members, or stockholders may be nonresident aliens, or other corporations or syndicates, unless all of the stockholders, members, or partners of such entities are persons related within the fourth degree of kinship to the majority of partners, members, or stockholders in the family farm corporation or syndicate; (emphasis supplied)

(2) Agricultural land acquired or leased, or livestock kept, fed or owned, by a cooperative organized under the laws of any state, if a majority of the shares or other interests of ownership in the cooperative are held by members in the cooperative who are natural persons actively engaged in the day-to-day labor and management of a farm, or family farm corporations or syndicates, and who either acquire from the cooperative, through purchase or otherwise, such livestock, or crops produced on such land, or deliver to the cooperative, through sale or otherwise, crops to be used in the keeping or feeding of such livestock; So a corporation may own real estate which is used for the keeping and feeding of livestock if the livestock so fed and kept on that real estate is owned by a qualified cooperative.

(3) Nonprofit corporations organized under state nonprofit corporation law;

(4) Agricultural land, which, as of the approval date of this amendment, is being farmed, or which is owned or leased, or in which there is a legal or beneficial interest, directly or indirectly owned, acquired, or obtained by a corporation or syndicate, if such land or other interest is

held in continuous ownership or under continuous lease by the same such corporation or syndicate. For the purposes of this exemption, land purchased on a contract signed as of the approval date of this amendment is considered as owned on that date;

(5) Livestock, which as of the approval date of this amendment, is owned by a corporation or syndicate. For the purposes of this exemption, livestock to be produced under contract for a corporation or syndicate are considered as owned, if the contract is for the keeping or feeding of livestock and is signed as of the approval date of this amendment, and if the contract remains in effect and is not terminated by either party to the contract. This exemption does not extend beyond the term of any contract signed as of the approval date of this amendment;

(6) A farm operated for research or experimental purposes, if any commercial sales from the farm are only incidental to the research or experimental objectives of the corporation or syndicate;

(7) Land leases by alfalfa processors for the production of alfalfa;

(8) Agricultural land operated for the purpose of growing seed, nursery plants, or sod;

(9) Mineral rights on agricultural land;

(10) Agricultural land acquired or leased by a corporation or syndicate for immediate or potential nonfarming (sic) purposes, for a period of five years from the date of purchase. A corporation or syndicate may hold such agricultural land in such acreage as may be necessary to its nonfarm (sic) business operation, but pending the development of the agricultural land for nonfarm (sic) purposes, such land may not be used for farming except under lease to a family farm corporation or family farm syndicate or a non syndicate or noncorporate (sic) farm;

(11) Agricultural lands or livestock acquired by a corporation or syndicate by process of law in the collection of debts, or by any procedures for the enforcement of a lien, encumbrance, or claim thereon, whether created by mortgage or otherwise. Any lands so acquired shall be disposed of within a period of five years and may not be used for farming before being disposed of, except under a lease to a family farm corporation or syndicate, or a nonsyndicate (sic) or noncorporate (sic) farm. Any livestock so acquired shall be disposed of within six months;

(12) Agricultural lands held by a state or nationally chartered bank as trustee for a person, corporation or syndicate that is otherwise exempt from the provisions of §§ 21 to 24, inclusive, of Article XVII;

(13) A bona fide encumbrance taken for purposes of security;

(14) Custom spraying, fertilizing, or harvesting;

(15) Livestock futures contracts, livestock purchased for slaughter within two weeks of the purchase date, or livestock purchased and resold within two weeks.

[¶ 5] § 23 of Article XVII of the South Dakota Constitution provides:

If a family farm corporation or family farm syndicate that has qualified under all the requirements of a family farm corporation or a family farm syndicate ceases to meet the defined criteria, it has twenty years, if the ownership of the majority of the stock

of such corporation, or the majority of the ownership interest of such syndicate, continues to be held by persons related to one another within the fourth degree of kinship or their spouses, and their land holdings are not increased, to either requalify (sic) as a family farm corporation or family farm syndicate or dissolve and return to personal ownership.

[¶ 6] § 24 of Article XVII of the South Dakota Constitution provides:

Any corporation or syndicate that owns agricultural land or engages in farming is required to report information necessary for the enforcement of §§ 21 to 24, inclusive, of Article XVII to the secretary of state on an annual basis, under rules promulgated by the secretary pursuant to state law. The secretary of state shall monitor such reports and notify the attorney general of any possible violations, and any resident of the state may also notify the attorney general of any possible violations. If a corporation or syndicate violates any provision of §§ 21 to 24, inclusive, of Article XVII, the attorney general shall commence an action in circuit court to enjoin any pending illegal purchase of land or livestock, or to force divestiture of land or livestock held in violation of §§ 21 to 24, inclusive, of Article XVII. The court shall order any land held in violation of §§ 21 to 24, inclusive, of Article XVII to be divested within two years and any livestock to be divested within six months. If land so ordered by the court has not been divested within two years, the court shall declare the land escheated to the state. If the attorney general fails to bring an action in circuit court to enforce §§ 21 to 24, inclusive, of Article XVII, any resident of the state has standing in circuit court to sue for enforcement.

[¶ 7] Having set forth the language of Amendment E, the court will now describe what the measure provides, what it does not provide, and what rules of law must be applied. The language used, almost without exception, is not ambiguous and therefore must be read and applied to the extent it is clearly written. This is not to say, as will hereinafter appear, that all portions of Amendment E are internally consistent. They are not. In fact, some provisions are hopelessly internally inconsistent and this complicates any reading and understanding of Amendment E.

[¶ 8] "It is a basic rule of statutory interpretation ... that a statute which is clear and unambiguous on its face is not subject to construction." *Northwest Paper Co. v. Federal Power Commission*, 344 F.2d 47, 50 (8th Cir.1965), (citing *Blair v. City of Chicago*, 201 U.S. 400, 26 S.Ct. 427, 50 L.Ed. 801 (1906); *Kansas City, Missouri v. Federal Pacific Electric Co.*, 310 F.2d 271, 273, 274 (8 Cir.1962), and 2 Sutherland, Statutory Construction, 334 § 4702 (3rd Ed.1943)). "When the language of a statute is clear, certain, and unambiguous, there is no occasion for construction, and the court's only function is to declare the meaning of the statute as clearly expressed in the statute." *American Meat Institute v. Barnett*, 64 F.Supp.2d 906, 915 (D.S.D.1999), (quoting *South Dakota Subsequent Injury Fund v. Casualty Reciprocal Exchange*, 1999 SD 2, ¶ 17, 589 N.W.2d 206, 209 (1999)), (quoting *Delano v. Petteys*, 94 SDO 700, 520 N.W.2d 606, 608), (quoting in turn *Petition of Famous Brands Inc.*, 347 N.W.2d at 884–85).

The South Dakota Supreme Court has "repeatedly stated that when the terms of a statute are clear, certain and unambiguous in their meaning, it is the function of the court to give them effect and not to amend the statute to avoid or produce a particular result." *S.D.E.A.*

*v. Barnett,* 1998 SD 84, ¶ 57, 582 N.W.2d 386, 399 (Zinter, Judge, concurring in part, dissenting in part) (quoting *Matter of Sales Tax Refund Applications,* 298 N.W.2d 799, 802 (S.D.1980)). " 'Unless exceptional circumstances dictate otherwise,' judicial inquiry into the meaning of a statute is complete once the Court finds that the terms of the statute are unambiguous." *S.D.E.A. v. Barnett,* 1998 SD 84, ¶ 57, 582 N.W.2d 386, 399 (Zinter, Judge, concurring in part, dissenting in part) (quoting *Burlington No. R. Co. v. Okla. Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404, 412 (1987)).

*American Meat Institute v. Barnett,* 64 F.Supp.2d at 915. Canons of statutory construction, when properly applied, are useful tools but are only aids to judicial interpretation which should not be applied when there is no ambiguity. *United States v. Vig,* 167 F.3d 443, 448 (8th Cir. 1999).

> Unless exceptional circumstances dictate otherwise, when the terms of a statute are unambiguous, judicial inquiry is complete. *See In re Erickson Partnership,* 856 F.2d 1068, 1070 (8th Cir.1988). "We ask not what the Congress means; we ask only what the statute means." *United States v. Hepp,* 656 F.2d 350, 353 (8th Cir.1981); *see, e.g., Northern States Power Co. v. United States,* 73 F.3d 764, 766 (8th Cir.1996) (stating that when "statutes are straightforward and clear, legislative history and policy arguments are at best interesting, at worst distracting and misleading, and in neither case authoritative").

*United States v. Vig,* 167 F.3d at 448.

■ [¶ 9] In the present case, provisions that would normally be statutory have been written into the South Dakota Constitution. The rules set forth above and other rules of statutory construction apply to readings of language in a state constitution as well. See, *e.g. State v. Neville,* 346 N.W.2d 425, 428 (S.D.1984), *In re Janklow,* 530 N.W.2d 367, 370 (S.D.1995) (citing *Levasseur v. Wheeldon,* 79 S.D. 442, 112 N.W.2d 894 (S.D.1962)), and *Cid v. South Dakota Dept. of Social Services,* 1999 SD 108, 598 N.W.2d 887 (SD 1999).

[¶ 10] Since it is clear that Amendment E is patterned to some extent from what was done in the Nebraska Constitution, the Nebraska provisions (upheld by the Nebraska Supreme Court and by the United States Court of Appeals for the Eighth Circuit but on much more narrow grounds than are presented here) will be compared with the South Dakota provisions as the court proceeds with the analysis.

> [I]t is an established rule of statutory construction that the adoption of a statute previously in force in some other jurisdiction is presumed to be the adoption of the interpretation thereof which had been theretofore placed upon it by the judicial tribunal whose duty it was to construe it. Black, Interpretation of Laws, p. 159, Sec. 70; *McDonald v. Hovey,* 110 U.S. 619, 628, 4 S.Ct. 142, 28 L.Ed. 269; *Sanger v. Flow,* 1 C.C.A. 56, 58, 48 F. 152, 154; *Blaylock v. Incorporated Town of Muskogee,* 54 C.C.A. 639, 117 F. 125.

*Harrill v. Davis,* 168 F. 187, 198 (8th Cir.1909). This rule applies, of course, only to the extent that the South Dakota language tracks what was done in Nebraska and only to the extent that the language was interpreted as a matter of statutory construction.

[¶ 11] Section 21 of Article XVII is very broad. It prohibits any corporation or syndicate from (1) acquiring or otherwise obtaining an interest, whether legal, beneficial, or otherwise, in any real estate used for farming in South Dakota, or (2) engaging in farming. These prohibitions are as

broad as possible as to corporations and syndicates.

[¶ 12] The court will analyze the first prohibition. Thus, "no corporation or syndicate" may, as to real estate "used for farming" in South Dakota (unless exempted by Section 22 of Article XVII) own it, lease it, acquire an easement, acquire an option, acquire a mineral interest, acquire a security interest or mortgage, acquire a statutory lien, acquire a contract for deed interest, become a beneficiary under a trust, or record a declaration of taking for purposes of eminent domain (SDCL 21–35 and SDCL 31–19).

[¶ 13] A corporation is defined in Amendment E as "any corporation" organized under the laws of any state or any country. This clearly covers not only business corporations but, unless otherwise specifically exempted, municipal corporations, nonprofit corporations, foreign business corporations, business development corporations (SDCL Chapter 47–10), local industrial development corporations (SDCL 5–14–22 and 5–14–23), community development corporations (SDCL 51A–4–20 and 51A–4–20.1), medical corporations, medical service corporations, chiropractic corporations, optometric corporations, podiatric corporations, physician's assistants corporations, nursing corporations, dental corporations, veterinary corporations, health care corporations, professional corporations for the practice of law, professional corporations for the practice of public accounting, professional corporations for the practice of engineering, architecture, or surveying, and cemetery corporations.

[¶ 14] We know that South Dakota, even when the legislature acts, has no legislative history to help guide courts. The intent of one or more members of the legislature is without legal significance in South Dakota. This includes the legislator or legislators who drafted or sponsored the legislation. Likewise, the intentions of the drafters of Amendment E or those who promoted it are without legal significance. It would be impossible, of course, to ascertain the intentions of the thousands of citizens of South Dakota who voted for Amendment E. We do not have here a factual scenario of elected delegates to a constitutional convention where a record is kept of all proceedings.

[¶ 15] "Syndicate" is defined in Amendment E as including any limited partnership, limited liability partnership, business trust (and the court notes that a business trust was defined by SDCL 47–14–1 at the time Amendment E was adopted, which definition has been revised and significantly broadened effective July 1, 2001, by SDCL 47–14A–1 (1)), and limited liability company organized under the laws of any state or country. "Syndicate" also includes a general partnership if any partner is a non-family farm syndicate or non-family farm corporation.

[¶ 16] Section 8(1) of the Nebraska Constitution is very similar to Section 21 of Article XVII of the South Dakota Constitution. There are some differences. The Nebraska language speaks of the prohibition covering the acquisition of or otherwise obtaining an interest "in any title" to real estate used for farming or ranching. South Dakota makes no reference to "any title" and no reference to "ranching." These differences, however, are legally immaterial.

[¶ 17] Nebraska, while also defining a syndicate, exempts from the definition of a syndicate a limited partnership in which the partners "are members of a family". This is a rather broad exemption. South Dakota has no such exemption. All limited partnerships are banned, so to speak, in South Dakota unless exempted in Section 22 wherein there is an exemption but only if a limited partnership is first formed

and a majority of the interests therein are held by members of a family (as defined as well in Section 22(1) of Article XVII) or a trust created for the benefit of a member of a family. In other words, a trust itself (standing alone, if you will, for the purpose of farming or owning agricultural land) is not exempt in South Dakota (unless exempted in Section 22) but may under certain circumstances be a member of a qualifying family farm corporation or a qualifying family farm syndicate.

[¶ 18] In Section 8(1) (the "companion" to South Dakota's Section 21), Nebraska exempts a "trust created for the benefit of a member of that family, related to one another within the fourth degree of kindred ... or their spouses, at least one of whom is a person residing on or actively engaged in the day to day labor and management of the farm or ranch, and none of whom are nonresident aliens. This shall not include general partnerships." Thus, Nebraska permits general partnerships to own or otherwise acquire an interest in agricultural land and to engage in farming, the reason being that Nebraska does not include a general partnership in the definition of "syndicate." South Dakota also does not include some general partnerships in the definition of "syndicate" but only if no partner in the general partnership is a non-family farm syndicate or non-family farm corporation. South Dakota in Section 21 speaks of a "business trust" whereas Nebraska in Section 8(1) speaks of a "trust."

[¶ 19] Turning to the second prohibition in Article 21, namely "engage in farming", "farming" means the cultivation of land for the production of crops, fruit or other horticultural products. It also includes the ownership, keeping or feeding of animals for the production of livestock or livestock products. Again, this language is all very broad. The Nebraska language is equally broad. A question may arise whether a non-qualifying entity may own land enrolled in the federal conservation reserve program, subject perhaps to the ultimate requirement of divestiture if farming activities later commence on the real estate. We must remember that the Amendment E prohibition is as to "any real estate used for farming." We must also remember that Amendment E defines "farming" as the "cultivation of land for the production of agricultural crops, fruit, or other horticultural products, or the ownership, keeping, or feeding of animals for the production of livestock or livestock products." This question, however, will not be answered in this opinion since there is no need to do so.

[¶ 20] Both states then specify certain exemptions. The South Dakota exemptions are found in Section 22. "Exemptions are based upon considerations of public policy. Constitutional and statutory provisions are to be given a reasonable, natural and practical construction to effectuate the purpose for which an exemption is created." *C.A. Wagner Const. Co. v. City of Sioux Falls*, 71 S.D. 587, 27 N.W.2d 916, 920 (1947) (quoting from *State ex rel. Eveland v. Erickson*, 44 S.D. 63, 182 N.W. 315). This same language was later quoted in *McFarland v. Keenan*, 77 S.D. 39, 84 N.W.2d 884 (S.D.1957).

[¶ 21] The first exemption (Section 22(1)) is a "family farm corporation or syndicate." This describes an entity engaged in farming "or the ownership of agricultural land" in which a majority of the partnership interests, shares of stock or other ownership interests are held by "members of a family or a trust (and this would seem at this point of reading Section 22 to mean 'any trust') created for the benefit of a member of that family." The language does not state "members of the same family." It states "members of a family" and all persons are obviously members of "a

family." A reasonable reading of the language, however, is that "family" is used in the singular and members of different families would not qualify in deciding whether members of "a family" own a majority interest. The language "trust created for the benefit of a member of *that family*" (emphasis supplied) also indicates that the correct interpretation is that members must be members of the same family under Amendment E.

[¶ 22] Family farm corporations and syndicates are not exempted as to acquiring any interests other than "ownership" unless that entity is also engaged in farming. Family farm corporations, family farm limited partnerships, and family farm limited liability companies, just like all other corporations, are covered by Section 21 and none are exempted in Section 22(1) as to acquiring easements or as to acquiring any interest (other than outright ownership), whether legal, beneficial, or otherwise in any agricultural real estate unless that entity is also engaged in farming. A "family" is defined as consisting of people related to one another within the fourth degree of kinship according to civil law "or" their spouses. At least one of those family members doing business in a family farm corporation or syndicate must reside on the farm or "be actively engaged in the day-to-day labor and management of the farm." As to both day-to-day labor and management functions, the family member must perform "both daily or routine (and there is obviously some ambiguity here since activity may well be routine without being on a daily basis) substantial physical exertion and administration." As to such corporation or syndicate, no stockholder or member may be a non-resident alien. The term "non-resident alien" is not defined in Amendment E and may mean an alien who is a non-resident of South Dakota although a resident of some other state. It may also mean an alien who is a non-resident of the United States. By statute, an alien who is not a resident of South Dakota or some other state or territory of the United States may not own agricultural land of more than 160 acres, except such land as was received by devise or inheritance. *See* SDCL 43–2A–2. Any such alien who may acquire such lands by devise or descent has three years from acquiring title to dispose of the land. *See* SDCL 43–2A–3. Taking into account Section 14, Article VI. of the South Dakota Constitution ("No distinction shall ever be made by law between resident aliens and citizens, in reference to the possession, enjoyment or descent of property") as well as decisions of the United States Supreme Court, the term "non-resident alien" as contained in Amendment E means an alien who is a non-resident of the United States.

[¶ 23] No member or stockholder (of the family farm corporation or syndicate) may be another corporation or syndicate unless all the persons who own interests in that other corporation or other syndicate are all persons related within the fourth degree of kinship (there being no reference in this sentence to spouses) to the majority of the persons who own interests in the family farm corporation or syndicate itself.

[¶ 24] The Nebraska first exemption is quite similar although it speaks of a family farm or ranch corporation; there is no reference to a ranch in the South Dakota provision. This is, however, legally immaterial since, as stated above, a ranch is covered by the definition of the term "farming" which relates back to the definition of real estate used for farming. The Nebraska first exemption deals only with family farm or ranch corporations and does not address syndicates. Nebraska provides that no corporation or partnership may be a stockholder in the farm or ranch corporation unless all the stockholders or partners of such entities are "persons related within the fourth degree of

kindred to the majority of stockholders in the family farm corporation." The Nebraska language is all one sentence. South Dakota has broken the language down to, in effect, five sentences in Section 22(1).

[¶ 25] No mention is made in Section 21 of any cooperative being subject to the prohibitions. That is true in the Nebraska provision as well. A cooperative is not a corporation. No one, at least in South Dakota, calls a cooperative a corporation. No one calls a cooperative a syndicate. Even a comparison of Section 21 (where the reference is to a corporation) with Section 22(2) makes it clear that if a cooperative was indeed a corporation intended to be exempted by Section 22(2), the word "corporation" would have been used in the exemption. It is not. The word "corporation" is never mentioned in the exemption.

[¶ 26] The South Dakota legislature has never presumed that a cooperative is the same thing as a corporation. See, *e.g.*, SDCL 10–47B–3 (32) in which the definition of a "person" is said to include, *inter alia*, "a corporation" and "a cooperative." Cooperatives in South Dakota are governed by SDCL Chapters 47–15 through 47–18 and by SDCL Chapter 47–20. Foreign cooperatives are governed by SDCL Chapter 47–19 and 47–20. Rural electric cooperatives are governed by SDCL 47–21. A cooperative receives very different treatment under federal laws than does a corporation. Cooperatives are, in general, pursuant to 26 U.S.C. § 501, exempt from federal income taxes, unlike the corporations sought to be reached by Amendment E. The corporations sought to be reached by Amendment E are, of course, not Subchapter "S" corporations. The very idea of a cooperative is an organization of members (not stockholders) entitled in some cases to distributions of earnings based upon patronage. In a corporation, a stockholder is not rewarded based upon the amount of business the stockholder does with the corporation. In fact, a corporation doing any substantial amount of business has no idea what business a stockholder may have conducted with the corporation. Obviously, the very broad prohibitions in Section 21 are not to be lightly or casually extended to cooperatives or to any other unmentioned entity. Nor is this court allowed to add entities or language to Section 21.

[¶ 27] Amendment E sprang from South Dakota's experiences with the statutory corporate farming restrictions found in SDCL Chapter 47–9A. SDCL 47–9A–2 (2) defines "corporation" or "any derivation of 'corporation'" as including "both corporations under the South Dakota Business Corporation Act and limited liability companies under the South Dakota Limited Liability Company Act." Governor William Janklow asked Attorney General Barnett for an official opinion as to whether the prohibitions in the corporate farming act apply to cooperatives. In Opinion No. 95–02 (not cited by any party in this case to the court), the Attorney General expressed his opinion to Governor Janklow that, even though a cooperative is defined at SDCL 47–15–1(2) as a "cooperative corporation", a cooperative is exempt from the Family Farm Act. This court agrees with that opinion of the South Dakota Attorney General.

[¶ 28] There are further clear reasons under South Dakota law why the word "corporation" does not include a "cooperative." "Whenever the meaning of a word or phrase is defined in any statute such definition is applicable to the same word or phrase wherever it occurs except where a contrary intention plainly appears." SDCL 2–14–4. SDCL 47–15–1(2) defines "[C]orporation as a corporation which is not a cooperative." Section 21 of Article XVII also makes no mention of a "foreign

cooperative" although we have a statutory definition of "foreign cooperative" at SDCL 47–15–2(4). SDCL 47–15–14 permits any "corporation" to "convert itself into a cooperative ..." Likewise, any "cooperative" may "convert itself into a business corporation ..." by virtue of SDCL 47–2–4.1. Obviously, if one entity may become something else by taking certain legal steps, such an entity is not "something else" until it has "jumped through the legal hoops." Finally, using any measure of common sense, any person on the street knows that a cooperative is not a corporation. If the people of South Dakota intended to include cooperatives and especially foreign cooperatives in the very broad prohibitions of Amendment E, they could have easily said so. They did not.

[¶ 29] The second exemption in South Dakota (Section 22(2)) deals with certain cooperatives. This is a very curious exemption since, as already explained, cooperatives are not described or listed at all in the general prohibitions contained in Section 21. In other words, there is nothing to exempt. An example comes to mind. The first section of a particular law states, *inter alia*, that "no person" shall engage in certain activities. The next section of the law exempts "domestic animals." Obviously, such an exemption would be meaningless. Since a cooperative is not a corporation, is not a syndicate, and is not covered by Section 21, the exemption is meaningless. There is not even a passing reference in Section 21 to cooperatives. The purported exemption as to cooperatives found in Section 22(2) extends only to agricultural land acquired or leased. Acquired means to own something. Lease means to lease something. The exemption does not state something to the effect of "agricultural land in which an interest has been acquired." The exemption language does not at all track the very broad and extensive language of Section 21, namely to "acquire, or otherwise obtain an interest,

whether legal, beneficial, or otherwise, in any real estate used for farming ..." The exemption is much more narrow and, if it has any purpose at all, does not exempt the acquiring of easements, options, or other possible interests in real property by cooperatives. In other words, if the exemption means anything, no cooperative may acquire any easement, any option in real estate, or any other possible interest in real estate in South Dakota. The exemption covers only ownership or leasing. Section 21 clearly distinguishes an acquisition (i.e.ownership) from acquiring some other non-ownership interest. If this exemption was held to be effective, it would only apply to cooperatives in which a majority of the shares or other interests are held by members of that cooperative which members are "natural persons actively engaged in the day-to-day labor and management of a farm, or family farm corporations or syndicates, and who either acquire from the cooperative, through purchase or otherwise, such livestock, or crops produced on such land, or deliver to the cooperative, through sale or otherwise, crops to be used in the keeping or feeding of such livestock." The idea, based on the evidence at trial, which apparently drove this particular exemption (in the minds of one or more of the sponsors only) was to exclude from farming and from ownership of agricultural land in South Dakota the so-called regional or national cooperatives, i.e. cooperatives owned by local cooperatives, the regional cooperatives being such as Farmland Industries, Harvest States–Cenex, Land 'O Lakes, Inc., and perhaps others. Such cooperatives are not owned by farmers as such. The question arises, however: how can such entities be excluded from the cooperative exemption when no cooperative, whether "local" or "regional" was covered in the first place by Section 21? This purported exemption is particularly troubling since one cannon of

statutory construction is that "legislative enactments should not be construed to render their provisions mere surplusage." *Dunn v. Commodity Futures Trading Com'n*, 519 U.S. 465, 472, 117 S.Ct. 913, 917, 137 L.Ed.2d 93 (1997). This cannon "is not an immutable physical law of the universe, but is simply a guide to statutory construction." *State Dept. of Assessments and Taxation v. Maryland Nat. Bank*, 310 Md. 664, 672, 531 A.2d 294, 298 (1987). There is as well an ancient maxim, *Surplusagium non nocet*, i.e. surplusage does not harm. *"If possible*, effect should be given to every part and every word (emphasis supplied)." *State ex rel. Oster v. Jorgenson*, 136 N.W.2d 870, 875 (S.D.1965). It is not "possible" to give Section 22(2) any effect without first adding the word "cooperative" to Section 21 or finding that a "cooperative" is a "corporation", there being no definition of "corporation" in Amendment E. As stated above, I decline to take either of such radical steps. The provisions of Section 22(2) are mere surplusage. In the alternative, the section is in conflict with the clear and unambiguous language of Section 21. To repeat: a "cooperative" is not a "corporation", at least in South Dakota, and there is therefore nothing to exempt in Section 22(2).

[¶ 30] The Nebraska Constitution has no such "cooperative exemption." That, of course, is not surprising since, as already discussed, the Nebraska general prohibition (dealing with corporations) does not mention cooperatives and no cooperative of any kind is circumscribed by the constitutional provision in Nebraska.

[¶ 31] South Dakota next exempts "[n]onprofit corporations organized under state nonprofit corporation law." Does state mean South Dakota? One would assume so. Is the word "law" to be interpreted as plural, thus covering nonprofit corporations from all states? There is no need to determine any of this since no nonprofit corporation is a party. The Nebraska exemption simply states that the provisions do not apply to "[n]onprofit corporations."

[¶ 32] The next exemption in South Dakota (Section 22(4)) is commonly referred to as a "grandfather clause." It is broadly written, much like Section 21. It allows non-family farm corporations and syndicates to do with agricultural land (other than raise livestock as will hereinafter appear) what they were doing on November 3, 1998, the date Amendment E became law. The broad exemption is for agricultural land which "is being farmed, or which is owned or leased, or in which there is a legal or beneficial interest, directly or indirectly owned, acquired, or obtained by a corporation or syndicate, if such land or other interest is held in continuous ownership or under continuous lease by the same such corporation or syndicate." Thus, while the stockholders or the partners may change, the exemption continues. The exemption as to leased property is not perpetual since no lease of agricultural land for more than twenty years is valid in South Dakota. *See* SDCL 43–32–2. Language dealing with a contract for deed is included in the exemption although a contract for deed is obviously included in the phrase contained in the first sentence of this particular exemption, namely "a legal or beneficial interest." The language dealing with a contract for deed is mere surplusage.

[¶ 33] Nebraska's "grandfather clause" is very similar although it, unlike South Dakota, allows for continuing ownership to meet the requirements of pollution control regulations. Nebraska also includes the surplus language as to a contract for deed.

[¶ 34] The next exemption in South Dakota (Section 22(5)) is the livestock exemption. A non-family farm corporation or syndicate is permitted (1) to continue to

own the livestock owned as of November 3, 1998, and (2) to continue to keep or feed livestock under contract as of November 3, 1998, until the contract expires or is terminated. Once any such contract expires or is terminated, the non-family farm corporation or syndicate may no longer acquire or keep and feed livestock. Unless a non-family farm corporation or syndicate had previously entered into a contract with some entity for the keeping and care of livestock, such entity is prohibited from acquiring or dealing with any new or replacement livestock after November 3, 1998. In other words, such entity could not replace the livestock as the livestock die, are sold or slaughtered. Thus, any such nonqualifying entity, even though it is permitted (by the terms of Amendment E) to continue to own pasture land owned as of November 3, 1998, could not acquire new or replacement livestock to be able to utilize the pasture land. Nor could the non-qualifying entity directly use any of its barns, sheds or shelters for livestock. Nebraska has no such provision. A further very significant problem for non-qualifying owners of pasture land is Article XVII, Section 7, of the South Dakota Constitution: "No corporation shall engage in any business other than that expressly authorized in its charter, nor shall it take or *hold any real estate except such as may be necessary and proper for its legitimate business*" (emphasis supplied). Thus, not only may the non-qualifying entity not use its pasture land to raise livestock, the entity may not even continue to own the pasture land since it may not engage in farming.

[¶ 35] The next exemption in South Dakota (Section 22(6)) is for a farm operated for research or experimental purposes but only if any commercial sales from the farm are "only incidental to the research or experimental objectives of the corporation or syndicate." The Nebraska provision is basically the same.

[¶ 36] Land leases by alfalfa processors for the production of alfalfa are exempted from Section 21 (Section 22(7)). Thus, any lease by a non-qualifying entity for the purpose of obtaining alfalfa to feed livestock is prohibited by Amendment E. The Nebraska provision is virtually identical.

[¶ 37] There is an exemption for agricultural land operated for the purpose of growing seed, nursery plants, or sod (Section 22(8)). The Nebraska provision is identical.

[¶ 38] Mineral rights on agricultural land (Section 22(9)), as in Nebraska, are exempted.

[¶ 39] The next exemption (Section 22(10)) is for agricultural land "acquired or leased by a corporation or syndicate for immediate or potential nonfarming (sic) purposes, for a period of five years from the date of purchase." It is clear that no non-qualifying entity having development in mind could own or lease the agricultural land for more than five years. When the five years has expired and the land is still agricultural land, the non-family corporation or syndicate would be in violation of Amendment E and would be required to dispose of the land or terminate the lease. During the five year period, the non-qualifying entity could not use the land for farming except by leasing it (either as the owner of the land or by virtue of a sublease of some kind) to a qualified family farm, whether that family farm is incorporated or not. This particular exemption is very narrow. It does track or match, for some unknown reasons, the broad prohibitions expressed in Section 21. In other words, the prohibition in Section 21 is much broader than the exemption in Section 22(11). The agricultural land must have been acquired, i.e. purchased and then owned, or leased from another entity. The exemption does not authorize easements, options to buy, or any other inter-

est, whether legal, beneficial or otherwise. This means that utility companies such as the three electric utility companies who are parties plaintiff in this case, pipeline companies, municipal corporations wanting to install water lines or sewer lines under agricultural property, railroads, wind power-er companies, and similar entities could not acquire easements; they would be required to purchase or lease the corridor as well as the sites for towers, windmills and other structures. However, even with a purchase or lease of the corridor, such an entity could not hold such ownership or leasehold interest for more than five years unless, at the end of the five year period and thereafter, the land was not used for any agricultural purpose.

[¶ 40] The language from the Nebraska Constitution is much the same as Section 22(10), although it refers also to "non-ranching (sic) purposes."

[¶ 41] The next exemption (Section 22(11)) allows agricultural land and live-stock to be acquired by a corporation or syndicate to enforce a lien or foreclose a security interest or mortgage. Again, the word acquired in this context clearly means to take ownership. The corporation or syndicate has five years to then dispose of the real estate and six months to dispose of the livestock. During the period that the real estate is held it may not be used for farming except under a lease to a family farm corporation, family farm syndicate, nonsyndicate (sic), or noncorporate (sic) farm. The exemption here does not deal with filing or obtaining any statutory lien but only with the enforcement of a lien and thus acquiring the land. It is clear that the exemption is not as broad as the language in Section 21, i.e. "acquire, or otherwise obtain an interest, whether legal, beneficial, or otherwise." What any possible rationale there might be for this is unknown to the court. This exemption as written in Section 22(11) would permit the

holder of a mechanic's lien or other statutory lien in effect on November 3, 1998, to foreclose the lien. Because Section 22(11) authorizes the acquisition (i.e.ownership) of agricultural land or livestock does not mean that the filing or recording of a lien is permitted. The exemption, however, must be read in conjunction with Section 22(13) which permits a "bona fide encumbrance taken for purposes of security", language also taken verbatim from the Nebraska provision.

[¶ 42] The Nebraska provision comparable to Section 22(10) is largely identical although no maximum holding period is specified for livestock so acquired.

[¶ 43] The next exemption (Section 22(12)) allows state or nationally chartered banks (without specifying that the bank in question must have legally authorized trust powers and without taking into account that many banks in South Dakota do not have legally authorized trust powers) to act as trustees for persons, corporations or syndicates but only if such persons, corporations or syndicates are already exempt from Amendment E. This constitutional provision overrides certain provisions of the banking and trust company statutory scheme under South Dakota law. This trust exemption as to entities (individual farmers, family farm corporations and family farm syndicates) already not covered by Section 21 tells us that, in the absence of the exemption, no agricultural land (and the exemption does not cover livestock) could ever be placed in or continued in trust by any person or entity engaged in farming or owning agricultural land. Otherwise, there would be no purpose for the exemption. At first blush, a "business trust" (a named prohibited entity in Section 21) probably did not include a so-called living trust or a testamentary trust since "business trust" was rather narrowly defined in SDCL 47–14–1 when

Amendment E was adopted. Since then, the definition has been substantially broadened by the South Dakota Legislature. *See* 47–14A–1. Thus, the ownership interests in a non-family farm syndicate or stock in a non-family farm corporation may not be placed in or continued in trust, either a so-called living trust or a testamentary trust, regardless of who is acting as trustee. The reason, of course, is that, if any such trust is a "business trust", it is a syndicate pursuant to Section 21 and is prohibited from engaging in farming or owning any interests in agricultural real estate. It is also clear that no farmer or rancher (regardless of the manner in which the farmer or rancher is doing business) may place or retain agricultural land in trust with an individual trustee such as a surviving spouse or child. Livestock may not be placed or retained in trust in any type of trust, regardless of the type of trustee. Some existing trusts in the course of estate planning in South Dakota have been established as irrevocable trusts. One or more of the individual plaintiffs already have agricultural property, real and personal, in trust.

■ [¶ 44] Trusts are commonly used to avoid probate, to save federal estate tax, and to allow the surviving spouse to receive all the income from the farm business enterprise with the farm business enterprise ultimately passing to a child or the children of the farm couple. Trusts holding agricultural real property and engaging in farming have been widely used for many years in South Dakota. Many farmers who established such a trust were already deceased when Amendment E came into being and probate courts had already ordered the establishment of the trusts and the transfers of property to the trusts from the decedents' estates. In many cases, the surviving spouse is already acting as trustee. Others have drawn wills with pour-over provisions into such a trust. Others still alive have agri-

cultural property already in trust. Having practiced law for 30 years and advised many farmer clients as to estate planning before taking office, I take judicial notice of these facts. As to all these trusts already established or in the process of probate (if a testamentary trust rather than a living trust was used) divestiture would be required by the provisions of Section 24, if Amendment E is constitutional.

[¶ 45] There are further trust considerations. Section 21 tells us that the term corporation "means any corporation organized under the laws of any state of the United States or any country." Section 21 does not tell us what syndicate "means." It tells us that the term "includes" certain entities. It does not tell us that trusts, other than "business trusts", are included or excluded. It tells us that "syndicate" does not include general partnerships "except general partnerships in which non-family (sic) farm syndicates or nonfamily (sic) farm corporations are members." Again, it does not tell us that certain trusts are "not included" in the definition of a syndicate.

[¶ 46] Nebraska has no such separate trust exemption provision, apparently because family trusts are specifically exempted by Section 8(1) of the Nebraska Constitution.

[¶ 47] As already noted, there is an exemption (Section 22(13)) for a "bona fide encumbrance taken for purposes of security." The quoted language was apparently copied from SDCL 47–9A–6 which language has not been interpreted by South Dakota courts. As already noted, Nebraska has an identical provision. This language, on a reasonable reading, authorizes the filing of a lien to acquire a mechanic's lien and the acquisition of other statutory liens permitted by South Dakota laws. A more careful drafter would have simply exempted acts permitted by South Dakota

law in connection with acquiring a mechanic's lien or any other lien granted by South Dakota statutes. For example, we have a trucker's lien for transporting livestock (SDCL 44–11–9), ambulance liens against agricultural real estate of the patient (SDCL 44–13–1) and the patient's spouse (SDCL 44–13–3), crop liens (SDCL 38–17–1 to 38–17–19), possessory liens for trespassing livestock (SDCL Chapter 40–28), veterinarians' vaccination liens (SDCL 4027–12, *et seq.*), liens in connection with the sale of livestock (SDCL 44–6–5), the vendor's lien (SDCL 44–6–1) and the vendee's lien (SDCL 44–6–2) against agricultural land, and perhaps other liens. The language used in the exemption could have been written in a more encompassing manner but will be read reasonably to permit an otherwise prohibited entity from acquiring these and other similar statutory liens.

[¶ 48] There is an exemption (Section 22(14)) for custom spraying, fertilizing, or harvesting. Nebraska has identical exemptions. It was the court's first thought that this language would obviate any concerns about a lien being acquired by operation of law as to these three activities, the thought being that Section 22(13) or, for that matter, Section 22(11), would not be sufficiently broad to cover such liens. It initially seemed odd to the court to refer to "custom spraying" and "fertilizing" other than the fact that the Nebraska exemption was copied. There are no South Dakota statutory liens for such activities. The concerns of the court initially related to a common rule of statutory construction, namely that once you start down a "laundry list", confusion may be created. Section 22(14) is a very short "laundry list." Under the maxim of construction known as *expressio unius est exclusio alterius;* the express mention in a statute of one thing implies the exclusion of other similar things. Black's Law Dictionary 581 (6th Ed.1990). The court is now convinced, however, that the language in this exemp-

tion does not relate to statutory liens. Instead, it is designed to make it clear that custom spraying, fertilizing, or harvesting of crops do not constitute "farming". The exemption matches, to some extent, SDCL 47–9A–2 (2) of the family farm act, where we are told that farming does not include "a contract whereby a processor or distributor of farm products or supplies provides spraying, harvesting or other farm services."

[¶ 49] In Section 22(15), Amendment E exempts livestock futures contracts, livestock purchased for slaughter within two weeks of the purchase date, "or" livestock purchased and resold within two weeks. Nebraska exempts livestock futures contracts, livestock purchased for slaughter (which is an exemption much broader than that of South Dakota), "or" livestock purchased and resold within two weeks.

[¶ 50] Nebraska exempts "Nebraska Indian tribal corporations." South Dakota has no such exemption. There are no provisions for Indian tribal corporations, as such, under South Dakota law. Tribes incorporate entities under general South Dakota law, either as a business corporation or as a non-profit corporation. Clearly, the State of South Dakota has no authority to regulate what the various tribes do in Indian Country in the use or ownership of agricultural land.

[¶ 51] Nebraska exempts agricultural land operated by a· corporation for the purpose of raising poultry. South Dakota has no such exemption.

[¶ 52] As provided by Section 23, a family farm corporation or family farm syndicate that is qualified and later ceases to meet the requirements of Amendment E must be dissolved. However, if a majority of the stock in the non-qualifying corporation or the majority interests in the non-qualifying syndicate are held by persons related to one another within the fourth

degree of kinship or their spouses, the non-qualifying entity may retain the land for twenty years but may not increase the land holdings. The Nebraska provision is virtually identical except the holding period is fifty years rather than twenty.

[¶ 53] By virtue of Section 24, all corporations and syndicates owning agricultural land or engaging in farming are required to file an annual report. This includes all such corporations and syndicates, whether family farms or not. The Attorney General is mandated to bring lawsuits to "enjoin any pending illegal purchase of land or livestock." This is a daunting task indeed to expect the Attorney General to know of all pending illegal purchases or acquisitions. The Attorney General is also mandated to bring lawsuits to force divestiture of land or livestock held in violation of Amendment E. State court judges are directed to order any land held in violation of Sections 21 through 24 to be divested in two years. If the court's order to divest in two years is not accomplished, the court is directed to order that the land is to escheat to the state. One must assume that these provisions do not override the grace period extended by Section 23 as to non-qualifying entities (which were at one time qualified) to divest in twenty years. The state court judge is to order divestiture of livestock within six months.

[¶ 54] Nebraska has a similar provision although the Nebraska Attorney General must have "reason to believe" that a violation is occurring before taking action.

[¶ 55] Admittedly, the court could be criticized for discussing Amendment E language not directly impacting one or more of the present plaintiffs. I fully recognize that decisions should not be written in the manner of law review articles or advisory opinions. I have, however, already provided to the parties my thoughts on what Amendment E says; they are fully aware of that and at that point I had not made a decision as to what portions of the language would become important in the court's decision. There is a further and more important reason: the court, as will hereinafter appear, is required to perform a balancing test, comparing putative local benefits of Amendment E with the burdens imposed on interstate commerce.

## DECISION

### I. Cooperatives

[¶ 56] Plaintiff Donald Tesch ("Tesch") owns a 1000 head hog confinement facility in South Dakota. He finishes hogs under a contract with Harvest States Cooperative, a regional cooperative. Harvest States provides Tesch with hogs weighing 40–65 pounds and he feeds them out to 240–265 pounds. Harvest States owns the hogs that Tesch feeds in his barns. If Tesch is required to own the animals that he feeds, he will require $350,000.00 to $450,000.00 each 18 week cycle to purchase the hogs. He has requested such financing from many banks; no bank has been willing to lend him money to buy his own hogs.

[¶ 57] Tesch's ten year contract with Harvest States expires in 2006. Because of Amendment E, Tesch has been notified by Harvest States that the contract cannot be renewed. Tesch comes before the court alleging that Amendment E may prohibit him from doing business (as he is now doing) with Harvest States.

[¶ 58] Mr. Tesch and Farm Bureau members are entitled to an answer as to cooperatives, regardless of whether Amendment E violates the United States Constitution, and I will provide that answer.

[¶ 59] Based on my previous discussion of whether or not cooperatives are included in Amendment E, it is clear that Tesch may continue to do business with a cooper-

ative, local or regional, and that Amendment E does not prohibit what he has been doing and apparently intends to continue to do. Given this interpretation of the law, there is nothing to enjoin as to Tesch or South Dakota Farm Bureau on behalf of its members who are in similar circumstances as Tesch.

## II. ADA

■ [¶ 60] The Eighth Circuit has held that private individuals can in fact sue state officials under the ADA for prospective, injunctive relief only. *Grey v. Wilburn*, 270 F.3d 607, 609 (8th Cir.2001). The Eighth Circuit held in *Gibson v. Arkansas Department of Correction*, 265 F.3d 718, 720 (8th Cir.2001) (quoting *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)):

> The Eleventh Amendment is not a bar to "federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to 'end a continuing violation of federal law.'"

The foregoing principle is equally applicable to non-employment claims based on Title II of the ADA. *Klingler v. Director, Dept. of Revenue*, 281 F.3d 776, 776 (8th Cir.2002), and *Randolph v. Rodgers*, 253 F.3d 342, 347–48 (8th Cir.2001).

[¶ 61] My prior order (which was not, of course, a final order) dismissing plaintiffs' ADA claim, which was issued prior to *Gibson* and *Grey*, is in error and should be rescinded.

■ [¶ 62] The allegations as to claims under the ADA in the original complaint are somewhat confusing and contradictory. It could be argued that only Farm Bureau has advanced such claims. "[F]or an association to have Article III standing to bring suit on behalf of its members, 'the interests at stake must be germane to the organization's purpose.'" *Central South Dakota Co-op. Grazing Dist. v. Secretary of U.S. Dept. of Agriculture*, 266 F.3d 889, 897 (8th Cir.2001) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Services*, 528 U.S. 167, 181, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000)). There is no evidence in the record to support associational standing as to the ADA claims by Farm Bureau, perhaps because of the erroneous previous ruling made by the court. Farm Bureau, however, like the Farmers' Union, broadly represents farmer members' interests before legislative and other bodies on a routine basis. The court takes judicial notice of this. Representing the claims of presently "disabled farmers" who are members of Farm Bureau and farmer members yet to become disabled may be something of a "stretch" but the court will allow the associational standing. It makes no difference, in any event, since ADA claims of plaintiffs Frank Brost ("Brost") and Marston Holben ("Holben") were submitted at trial as offers of proof which offers of proof are now accepted by the court. The court also construes the ADA allegations in the original complaint as including Brost's and Holben's claims.

[¶ 63] Brost owns a ranch in Western South Dakota, lives about two hours drive away from his ranch and, at the time of trial, had not been to the ranch for six weeks. Brost is 65 years old and is physically unable to do the physical activities required to maintain the ranch or any other strenuous physical labor. He has had serious heart problems, underwent surgery shortly before the trial, and was unable to even travel from his home near Rapid City to the place of trial. Brost does the planning, marketing, and financing. He is the final decision-maker for the ranch. Physical labor required to run the ranch is performed by his ranch foreman, David Newbold ("Newbold").

[¶ 64] Brost's ranch is owned by four separate entities. The first entity is Brost

Land and Cattle Company, a South Dakota corporation incorporated in 1979. Brost is the sole shareholder. This corporation owns 3,100 acres of agricultural land, all of the equipment involved in the cattle operation, and most of the cattle.

[¶ 65] The second entity is the Frank Brost Limited Partnership which owns land that Brost inherited from his parents. He is the general partner while his three sons each have a 1.5% ownership share. As part of his estate planning, Brost planned to gift each year a portion of this limited partnership to his three children. One of Brost's sons works for General Mills and lives in Minneapolis. Another son lives in Sioux Falls and works for Gateway. A third son teaches and lives in Rapid City. None of the sons take any part in the management or physical operation of the ranch.

[¶ 66] The third entity is the Brost/Newbold Limited Liability Partnership, formed in 1998 as a "retirement plan bonus" for Brost's ranch foreman, David Newbold. Brost owns 88% of the partnership interests, Brost Cattle Company owns 1%, and Newbold owns 11%. Brost gifts $10,000.00 worth of units in the partnership to Newbold each year as an incentive to keep Newbold employed. This limited liability entity owns 2,080 acres of ranch land.

[¶ 67] Brost also owns land and cattle personally. There are no buildings of any kind on the land owned by the Brost Limited Partnership or on the land owned by the Brost/Newbold Limited Liability Partnership. There is no residence on the land owned by Brost Land and Cattle Company.

[¶ 68] The cattle owned personally and by the corporation are fed to 600–800 pounds and then sold primarily to livestock feeder operations to be finished. The cattle must be owned for more than two weeks (thus not qualifying for any possible exemption from Amendment E) in order to feed them out to 600–800 pounds.

[¶ 69] Brost transferred ownership of his ranch land, livestock, and equipment to limited liability entities in order to obtain financing. The banks that he does business with would not loan him money unless ownership of the ranch was held in a limited liability format. If Brost is forced to divest himself, he will pay significant capital gains taxes of at least $400,000.00. Financially, Brost would be unable to continue owning the ranch if he cannot own it in a limited liability format.

[¶ 70] Mr. Holben lives in Phoenix, Arizona. He and his wife created a living trust in which they are the trustors, trustees, and beneficiaries. The trust owns all stock in Spear H Ranch, LLC. Spear H Ranch consists of 2,600 acres of grassland in Butte County, South Dakota. Holben's South Dakota residence is between 45 and 50 miles from the ranch. He spends up to eight months a year in Arizona and the remaining time in South Dakota. There is no residence, no running water, and no electricity on the land owned by Spear H Ranch.

[¶ 71] The Holben LLC owns steers which feed on the grassland. These steers are owned for more than two weeks at a time. They are bought in the Spring and sold in the Fall.

[¶ 72] Holben does not and cannot do day-to-day labor on the ranch. He is absent from the ranch for at least two to three weeks at a time. He is absent when he is living in Arizona. Due to 1989 heart bypass surgery, Holben is unable to do any strenuous work on the ranch or anywhere else. He contracts out fence repair and hires cowboys to do all the physical cowboy work, such as checking cattle, rounding up cattle who stray, and tending to the animals' medical needs. The only physical work (if it can even be called that)

Holben is able to do consists of riding into the pasture on a horse or all-terrain vehicle to count the cattle and check for pink eye. Clearly, these limited activities do not meet the requirements of any Amendment E exemption.

[¶ 73] Title II of the ADA provides, in part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. That provision does not limit the ADA's coverage to conduct that occurs in the "programs, services, or activities" of the State but is instead a "catch-all phrase that prohibits all discrimination by a public entity, regardless of the context." *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 45 (2nd Cir.1997), overruled on other grounds by *Zervos v. Verizon New York*, 252 F.3d 163, 171 n. 7 (2nd Cir.2001).

[¶ 74] "Title II applies to anything a public entity does. Title II coverage, however, is not limited to 'Executive' agencies, but includes activities of the legislative and judicial branches of State and local governments." 28 CFR Part 35, Appendix A— Preamble to Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services (Published July 26, 1991). At least two circuits have held that Title II of the ADA applies to zoning decisions made by a city. *See Innovative Health Systems, Inc. v. City of White Plains, supra*, and *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730 (9th Cir. 1999). Zoning ordinances are analogous to Amendment E. Zoning ordinances limit how property may be used and, indirectly, who may use the property. Amendment E limits the use of South Dakota agricultural land (prohibiting its use for farming) by

disabled individuals (those who cannot do substantial physical exertion on a daily basis) who own the land in a limited liability format.

[¶ 75] South Dakota may legislatively place certain restrictions on how property is used. The State may legislatively place certain restrictions on who may use property. The State may not, however, base those restrictions on impermissible categories such as religion, race, gender, and, under the ADA, disability.

■ [¶ 76] A corporation, of course, cannot have a disability. "It is well established that a shareholder or officer of a corporation cannot recover for legal injuries suffered by the corporation." *Audio Odyssey, Ltd. v. Brenton First Nat. Bank*, 245 F.3d 721, 729 (8th Cir.2001). "The rule applies even to a corporation's sole shareholder." *Id.* However, the foregoing " 'shareholder standing rule' does not apply when the alleged injury is distinct from that suffered by the corporation or other shareholders." *Id.* "A 'distinct' injury is one in which the claimant's rights have been violated, not merely one in which the claimant is indirectly harmed because of one party's injury to another." *Id.* Amendment E does more than place limits on limited liability entities; it prohibits disabled persons who cannot live "on the farm" from owning South Dakota agricultural land in a limited liability format and using such land for farming. Non-disabled persons are not so limited.

The Supreme Court has made it clear that the ADA "addresses substantial limitations on major life activities, not utter inabilities." *Bragdon v. Abbott*, 524 U.S. 624, 641, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). A person is substantially limited in working if he or she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as

compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Because disability is determined on a case-by-case basis, "[a] court must ask whether the particular impairment constitutes for the particular person a significant barrier to employment." *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 488 (8th Cir.1996) (internal quotation omitted). *Moysis v. DTG Datanet,* 278 F.3d 819, 825 (8th Cir.2002). As in *Moysis,* "[t]his is not a case, then, in which plaintiff's condition causes difficulty with a single aspect of a single job position." *Moysis v. DTG Datanet,* 278 F.3d at 825 (quoting *Maziarka v. Mills Fleet Farm, Inc.,* 245 F.3d 675, 680 (8th Cir.2001)). Brost and Holben are physically unable to perform all of the physical labor required to raise livestock on their South Dakota ranch land. Performing substantial physical exertion is a prerequisite under Amendment E to engaging in farming as a member of a limited liability entity. Some member of the entity must be a non-disabled individual or a person who lives "on the farm." The only member of the Brost Land and Cattle Co. Inc. is a disabled individual. A non-disabled farmer need not live on the farm. A disabled farmer would be required to live on the farm to be able to conduct business in a limited liability format. People who are disabled obviously tend to prefer to live in or very near larger communities with health care facilities able to promptly and easily meet their medical needs. There is no such facility in or even near Lyman County, South Dakota, the location of the Brost ranch. Brost would be hours away from medical care he needs.

[¶ 77] Amendment E harms Brost and Holben individually in their abilities to own and use agricultural land in a limited liability format. They have shown a distinct injury from that of the entities in which they own an interest.

[¶ 78] Brost's and Holben's farming activities do not qualify under the "grandfather clause" because, as discussed previously, they purchase cattle in the spring, which cattle would not be "grandfathered." The effect of Amendment E, as discussed above, is to prevent those individuals who cannot live on the farm or perform "both daily or routine substantial physical exertion and administration" from owning in a limited liability format South Dakota agricultural land for the feeding of livestock if such livestock are purchased in the spring and sold in the fall. Those individuals not only could not engage in the occupation of raising cattle; they would have to dissolve their limited liability entities or sell their grass land. Plaintiffs have shown that Amendment E constitutes an attempt to override the ADA.

[¶ 79] Any state law and state constitutional provision which conflicts with federal law is preempted under the Supremacy Clause of the United States Constitution. U.S. Const. Art. VI, cl. 2. Congressional intent to preempt state law can either be expressed in statutory language or implied in the structure and purpose of the federal law in question. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

[¶ 80] State law is "pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, *or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress".* *South Dakota Min. Ass'n, Inc. v. Lawrence County,* 155 F.3d 1005, 1009 (8th Cir.1998) (*citing California Coastal Comm'n v. Granite Rock Co.,* 480 U.S. 572, 581, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987)) (emphasis in original). Amendment E directly collides with the ADA. It is impossible for the defendants to enforce and comply with Amendment E

without violating the ADA. As has been stated: "We first note that we know of no authority for the proposition that a law that is facially invalid under the Commerce Clause may nonetheless be upheld 'as enforced.'" *Ben Oehrleins & Sons & Daughter v. Hennepin County,* 115 F.3d 1372, 1383 (8th Cir.1997). The same principle should be applied to Amendment E, the provisions of which cannot be severed to delete the offending language as to the ADA.

[¶ 81] "Where a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993). Article XVII, sections 21–24 of the South Dakota Constitution are, in part, contrary to the Supremacy Clause of the United States Constitution. Amendment E is therefore void. As previously discussed, since unconstitutional provisions of the South Dakota Constitution cannot, as a matter of law, be severed, the entirety of Amendment E must fall.

## III. Commerce Clause

[¶ 82] Montana–Dakota Utilities Company, Northwestern Public Service Company and Otter Tail Power Company are collectively known as the Big Stone Partners. Together they own and operate the very large Big Stone Power Plant in South Dakota (Big Stone I). The percentage of ownership of the plant changed in the mid 1980's, reflecting changing power usages by the individual partners.

[¶ 83] Land owned in conjunction with the power plant includes farm land not directly being used for power production activities. This land is leased to local farmers and generates income of approximately $15,000.00—$20,000.00 annually. The land is clearly necessary to present and future operations of the power plant.

[¶ 84] If the partners again wish to change the percentage of ownership interests to reflect a changing trend in usages, they would no longer qualify under the grandfather provisions. Amendment E would require the newly configured partners to divest that portion of the land owned by the partners which is unimproved agriculture land. Divestiture would result in loss of income to the partners. Amendment E effectively precludes the partners from ever changing the percentage of ownership of the power plant site.

[¶ 85] The partners are in the process of preparing to build a second power plant (Big Stone II). Big Stone II will be physically located on land already owned by the partners. The cooling pond will be located on land yet to be acquired. Big Stone II will not be owned by the current Big Stone Partners. Land now owned by the Big Stone Partners will have to be conveyed to the new owners of Big Stone II. Amendment E prohibits any limited liability entity, including the Big Stone Partners, from owning, leasing, acquiring an easement, or acquiring an option to purchase real estate "used for farming" in South Dakota, unless such ownership pre-existed Amendment E and is allowed under the grandfather clause. The ownership interests associated with Big Stone II would not fall under the grandfather clause. It takes between five and ten years to develop and build a power plant. Thus, the owners of Big Stone II would not be able to purchase and own the land for the construction of the plant unless they can convert the land into the plant facility within five years. If they exceed that deadline, Amendment E would require divestiture.

[¶ 86] Big Stone II will require the acquisition of new transmission power line corridors over South Dakota agricultural land and such corridors will extend into

other states. The exemption in Section 22(10) of Amendment E for agricultural land "acquired or leased by a corporation or syndicate for immediate or potential nonfarming (sic) purposes" does not exempt from Amendment E and therefore permit easements, options to buy, or any other interest, whether legal, beneficial or otherwise. Again, the exemption for some unknown illogical reason was not drawn to "track" the broad prohibitions contained in Section 21. This means that utility companies such as the three electric utility companies who are parties plaintiff in this case could not acquire easements; they would be required to purchase or lease the corridor as well as the sites for any structures such as high-line towers. The purchase of land within the corridor for a transmission line tower is two to three times more expensive than the purchase of a mere easement. Even with the purchase or lease of the corridor, the utility companies could not retain such ownership or leasehold interest for more than five years unless, at the end of the five year period and thereafter, the land was not used for any agricultural purpose. The corridors thus could not be farmed by the local farmers. The agricultural land would necessarily lay fallow. Utility companies would incur the expense of hiring someone to keep the weeds at bay, in perpetuity. Where those corridors run through pasture land, fences would have to be erected by the utilities to prevent grazing, an activity which is clearly included in the definition of farming.

[¶ 87] Because of the Amendment E restrictions on use of corridors, it is unlikely that those who own and farm South Dakota agricultural land would voluntarily sell transmission line corridors to the utilities or to others seeking corridors, such as pipeline companies, wind power companies, railroads, and other entities. The farm family would have to sell (or lease for a limited number of years, not to exceed 20) the 120 foot wide corridor through the farm property, thus dividing the farm property. With the corridor being fenced, the farmer would, in the absence of gates, be prohibited from passing through the corridor to gain access to the remaining portion of the farm. If the farm family did agree to sell or lease such a corridor, they would be creating two separate fields or pastures, requiring two separate ingress roads and, in the case of pasture land, perhaps two separate sources of water. It is unlikely that farmers would agree to this without exacting an exorbitant fee, if at all. Condemnation would likely be required in virtually every case, substantially increasing the cost of doing business in an industry where a profit is guaranteed by virtue of rates charged consumers. Without question, state regulatory bodies will permit if not require that these costs of doing business be passed on to utility customers. Thus, higher rates would be spread among all customers of the utility companies, regardless of where the customers live, inside or outside South Dakota.

[¶ 88] Otter Tail Power Company, which has its principal place of business in Fergus Falls, Minnesota, has interstate transmission lines between South Dakota and other states and serves customers in both South Dakota and Minnesota. Likewise, Montana–Dakota Utilities Company serves customers inside and outside South Dakota.

[¶ 89] The Commerce Clause (Art. I, § 8, cl.3) of the United States Constitution authorizes Congress "to regulate commerce ... among the several States." Thus, Congress has been granted the power to so regulate, necessarily restricting the power of any state to regulate interstate commerce. Plaintiffs contend that the limited liability organization farming ban in Amendment E violates the dormant Commerce Clause. The U.S. Supreme Court has recognized a dormant Com-

merce Clause which limits an individual state from adopting "regulations that discriminate against interstate commerce." *West Lynn Creamery, Inc., v. Healy,* 512 U.S. 186, 192, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). As I explained in *American Meat Institute, et al. v. Barnett,* 64 F.Supp.2d 906, 917 (D.S.D.1999):

The Dormant Commerce Clause "pro-' hibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *West Lynn Creamery, Inc., v. Healy,* 512 U.S. 186, 192, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994), quoting *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 273–274, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988).

In judging Constitutional challenges to state statutes under the Dormant Commerce Clause, the U.S. Supreme Court has developed a two-tier approach. *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 578–579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). The first tier is simple enough. If the challenged state statute "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests," the U.S. Supreme Court has "generally struck down the statute without further inquiry." *Id.* at 579, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552. The United States Court of Appeals for the Eighth Circuit, in explaining this tier, teaches that "a state regulation is per se invalid when it has an 'extraterritorial reach,' that is, when the statute has the practical effect of controlling conduct beyond the boundaries of the state." *Cotto Waxo Company v. Williams,* 46 F.3d 790, 793 (8th Cir. 1995).

A state statute that directly regulates or discriminates against interstate commerce is subject to strict scrutiny.

*Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). To withstand the Constitutional challenge, the state must show "that the statute serves a legitimate local purpose unrelated to economic protectionism and that the purpose could not be served as well by nondiscriminatory means." *Cotto Waxo,* 46 F.3d 790 at 793, *citing Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). Therefore, if the ... statute is found to directly regulate or discriminate against interstate commerce, strict scrutiny applies and the statute can only be upheld upon a significant showing by the state that it is not striving for economic isolation.

The second tier approach is utilized when a state statute only indirectly affects interstate commerce and regulates evenhandedly. *Brown–Forman Distillers Corporation v. New York State Liquor Authority,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). The inquiry is whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Id., citing Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). This balancing test weighs the burdens of the statute on interstate commerce with the putative local benefits. *Cotto Waxo,* 46 F.3d at 793. If the burden on interstate commerce is slight and the public benefit is great, then the statute can be upheld.

The Court must first determine if the ... statute directly regulates or discriminates against interstate commerce. If so, then tier I is applied and the statute is per se unconstitutional and it can be saved only by a tremendous showing by the state of its local benefit and the absence of any other means to achieve that benefit. If the statute indirectly affects interstate commerce, then tier II

applies. The Court must then balance the burdens on interstate commerce with the local benefits. If the benefits are greater, then the statute does not violate the Dormant Commerce Clause.... In addition, the United States Court of Appeals for the Eighth Circuit teaches that the Dormant Commerce Clause invalidates state statutes which require people or businesses to conduct their out-of-state commerce in a certain way. *Cotto Waxo*, 46 F.3d at 793 (*citing Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032, and *Brown–Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552, for that proposition). If a state statute requires out-of-state commerce to be conducted according to in-state terms, then the statute burdens interstate commerce. *Cotto Waxo*, 46 F.3d at 793 ...

*Brown–Forman* teaches us or reaffirms a number of legal principles already discussed. As we analyze state economic regulation under the Dormant Commerce Clause, the critical consideration for the court is the overall effect of the state law on both local and interstate activity. Any state statute that directly regulates interstate commerce is to be struck down without further inquiry. However, a statute having only indirect effects on interstate commerce and which regulates evenhandedly is to be examined in the context of whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. There is no clear line which separates the category of state regulation that is virtually per se invalid under the Dormant Commerce Clause and the category subject to the *Pike v. Bruce Church* balancing approach ... Negatively affecting interstate commerce is not the same as discriminating against interstate commerce.

[¶ 90] Plaintiffs contend that Amendment E fails the "first tier" of the *Brown–Forman* test, the "discrimination" tier. " 'Discrimination' for purposes of the Commerce Clause" means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Ben Oehrleins and Sons and Daughter, Inc. v. Hennepin County*, 115 F.3d 1372, 1383 (8th Cir.1997) (quoting *Oregon Waste Sys. Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 99, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994)). "A state law may discriminate against interstate commerce on its face, in its purpose, or in its effect. *SDDS, Inc.*, 47 F.3d at 267." *Ben Oehrleins*, 115 F.3d at 1383.

[¶ 91] Plaintiffs contend that Amendment E is facially discriminatory and thus unconstitutional under the dormant Commerce Clause based upon a reading of the exceptions set forth in Sections 22(1) through 22(15) which exceptions, plaintiffs claim, "have the consequence of securing to South Dakota farmers many of the benefits of a limited liability format while denying farmers or farm investors in neighboring States such benefits." Certainly, a reading of exceptions to a statute may demonstrate a "pattern of parochialism apparent in [the] statute" which would demonstrate a purpose to discriminate against interstate Commerce. *Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662, 676 n. 22, 101 S.Ct. 1309, 1319 n. 22, 67 L.Ed.2d 580 (1981).

[¶ 92] Amendment E grants farmers who are South Dakota residents and live on the farm (or who have a family member who lives on the farm) leeway in controlling decisions about their limited liability formats; this leeway is denied to a nonresident disabled farmer who, for example, lives just across the state line but wishes

to own and manage farm land in South Dakota in a limited liability format. This is in the nature of mere surplusage since the court has already found clear violation of the ADA. A farmer living in a distant state who owns South Dakota farm land would be unable to comply with the exceptions for those who live on the farm or perform daily substantial physical labor. Such farmer would be able personally to do neither in a limited liability format. By the same token, a person engaged in agriculture who lives in Aberdeen, for example, and wishes to manage farm land in Lyman County also could personally not do business in a limited liability format. Thus, there is no inherent discrimination in the context of the dormant Commerce Clause against non-resident non-disabled farm land owners. In that sense, Amendment E is not subject to strict scrutiny since it serves a legitimate local purpose unrelated to economic protectionism.

[¶ 93] "Extraterritorial reach invalidates a state statute when the statute requires people or businesses to conduct their out-of-state commerce in a certain way." *Cotto Waxo Co. v. Williams*, 46 F.3d at 793. "[A] statute has extraterritorial reach when it necessarily requires out-of-state commerce to be conducted according to in-state terms." *Id.* at 794. Amendment E does not require out-of-state limited liability entities to conduct their commerce according to South Dakota's terms. While Amendment E may affect their participation in interstate commerce, Amendment E itself is indifferent to commerce occurring out-of-state. Foreign limited liability entities are able to conduct their out-of-state commerce regardless of their relationship to South Dakota. *Id.* I conclude that Amendment E does not suffer from an unconstitutional extraterritorial reach as to out-of-state farmers or out-of-state limited liability entities.

[¶ 94] Plaintiffs claim also that Amendment E is targeted at the livestock industry and it is therefore inherently an attempt to regulate interstate commerce, which regulation, *Brown–Forman* teaches us, is a violation of the dormant Commerce Clause. There was some evidence at trial that Amendment E was motivated by discriminatory purposes. Discriminatory purpose can be established by direct evidence, such as the language of the measure itself or the rhetoric of the legislative history of the measure. Since the initiated measure was adopted, the "pro" statement in the state sponsored ballot pamphlet is the most important. *SDDS, Inc. v. State of South Dakota*, 47 F.3d 263, 270 (8th Cir.1995). The legislative history of Amendment E includes a pamphlet widely circulated by the Secretary of State which sets forth a pro-amendment and an anti-amendment position. Part of that pamphlet argues that voters should protect South Dakota from out-of-state interests. This is clearly some evidence of discriminatory purpose. The expressed purpose, however, is more broad, namely to retain family farms and to prevent limited liability entities, regardless of their home base, from gaining control of the food supply. I decline to find sufficient discriminatory purpose.

[¶ 95] Plaintiffs also contend that Amendment E is discriminatory in its *effect*. "Negatively affecting interstate commerce is not the same as discriminating against interstate commerce. In a Commerce Clause context, 'discrimination' means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Cotto Waxo Co. v. Williams*, 46 F.3d at 794. Plaintiffs contend that Amendment E "has the effect of excluding corporate investors from raising or finishing livestock in South Dakota since such inves-

tors cannot satisfy the narrow family farm exception of Section 22(1)." While Amendment E prevents out-of-state limited liability entities from raising livestock in South Dakota, it does not prevent them from raising livestock elsewhere. In that sense, Amendment E does not affect how these entities conduct business outside South Dakota. Evidence was presented that Amendment E has prevented millions of dollars of commercial development, to the permanent detriment of the economy in South Dakota. While the cost of doing business in South Dakota may have risen for all concerned, namely both in-state and out-of-state limited liability entities, and while that may suppress future development in South Dakota, that does not translate into unconstitutional discrimination and the contentions of the plaintiffs in this regard are rejected.

[¶ 96] Plaintiffs suggest that the State's claimed interests as to Amendment E cannot be considered "compelling." In 1982, Nebraska voters adopted an amendment to the Nebraska Constitution, the objective being to prohibit non-family farm corporations from owning and operating Nebraska farm and ranch land. The United States Court of Appeals for the Eighth Circuit, in the context of an equal protection challenge, held that Nebraska's purpose in enacting this somewhat similar corporate farming ban (although clearly considerably narrower than Amendment E) "represents a legitimate state interest under the equal protection clause (citing cases)." *MSM Farms, Inc. v. Spire*, 927 F.2d 330, 333 (8th Cir.1991). The conclusion was: "The people of Nebraska have made a reasonable judgment that prohibiting non-family corporate farming serves the public interest in preserving an agriculture where families own and farm the land. It is not for the courts to second-guess the wisdom of this judgment. The equal protection clause is satisfied if the law adopted through the initiative process is rationally related to a legitimate state interest. The district court properly applied this test ... and its judgment upholding the law is hereby affirmed." *Id.* at 335. The case from Nebraska did not involve challenges under the dormant Commerce Clause. The evidence presented in court, the court's knowledge of the economic hardships endured by family farmers in competing with large "other players" in agriculture, and the evidence of fears of spoilation of the environment by entities in which the owners are sheltered from personal responsibility all show not only a legitimate state interest but a compelling state interest.

[¶ 97] Plaintiffs contend, nonetheless, that this Court should reject the rational basis test applied in *MSM Farms* and instead apply a "rational basis with bite" standard. Plaintiffs cite *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), in support of this claimed new heightened scrutiny standard. *Romer* did apply the traditional rational basis test but concluded that the Colorado amendment "lacks a rational relationship to legitimate state interests," *Id.* at 632, 116 S.Ct. at 1627, because a "desire to harm a politically unpopular group [homosexuals] cannot constitute a legitimate governmental interest." *Id.* at 634, 116 S.Ct. at 1628.

[¶ 98] Plaintiffs argue that *Romer* stands for the proposition that where a statute identifies persons by a single trait, in this case a limited liability business format, heightened scrutiny must be applied—a "breadth" test. Plaintiffs claim that the limited liability ban on farming is overbroad in that it will prohibit real family farmers, such as the individual plaintiffs, from continuing in their business. While this might be true (as to continuing in business) in the absence of the court striking down Amendment E, it is of no legal

consequence. *Romer* does not stand for the proposition advanced by plaintiffs.

[¶ 99] In *MSM Farms,* no argument was advanced that the measure involved "any suspect classifications." Disabled persons have not yet been held by the courts to constitute a "suspect classification." A permanently disabled person, however, like persons of a particular gender, race, or national origin cannot change his or her status. Suffice it to say that this court is suspicious of classifications based on being permanently disabled as distinguished from robust health and fitness.

[¶ 100] In 1932, North Dakota voters adopted an initiated measure which required corporations, both domestic and foreign, to dispose of agricultural land within ten years. The United States Supreme Court held that the "fourteenth Amendment does not deny to the state power to exclude a foreign corporation from doing business or acquiring or holding property within it." *Asbury Hospital v. Cass County, N.D.,* 326 U.S. 207, 211, 66 S.Ct. 61, 63, 90 L.Ed. 6 (1945). Even legislation excluding a corporation from continuing in the state, which legislation is subsequent to the corporation's acquisition of property, can be sustained. *Id.* at 211–12, 66 S.Ct. at 63–64. *Asbury Hospital* further held that the North Dakota statute's exclusion for farm corporations did not deny equal protection. *Id.* at 213, 66 S.Ct. at 65. "Statutory discrimination between classes which are in fact different must be presumed to be relevant to a permissible legislative purpose, and will not be deemed to be a denial of equal protection if any state of facts could be conceived which would support it." *Asbury Hospital,* 326 U.S. at 215, 66 S.Ct. at 65. No issue was raised or decided as to the dormant Commerce Clause.

[¶ 101] Amendment E, like similar limited liability entity farming bans in North Dakota and Nebraska, appears to be designed to prohibit large corporations, which already largely control the ultimate processing and distribution of agricultural commodities, from vertically integrating an industry to the competitive exclusion of the traditional family farmer. "It is within the province of the legislature to enact a statute which regulates the balance of competitive economic forces in the field of agricultural production and commerce, thereby protecting the welfare of its citizens comprising the traditional farming community, and such statute is rationally related to a legitimate state interest." *State ex rel Webster v. Lehndorff Geneva, Inc.,* 744 S.W.2d 801, 806 (Mo.1988) (citing *Asbury Hospital* and *Omaha National Bank v. Spire* ).

[¶ 102] None of the foregoing, however, is the end of the inquiry. Regulating or more correctly over-regulating interstate utility corridors and very likely excluding new investments in electric and wind power generation and transmission facilities intended for interstate use could constitute direct regulation of interstate commerce by South Dakota rather than by the Congress. A state measure that directly regulates interstate commerce is subject to strict scrutiny and the State would then be required to show that the measure serves a legitimate local purpose unrelated to economic protectionism and that the purpose could not be served as well by nondiscriminatory means. Amendment E stems from a degree of economic protectionism which can well be accomplished by exempting utilities from any such regulation. All of this has to do with the "first tier."

[¶ 103] The court, however, need not cross the "first tier bridge" and chooses to rely on the so-called "second tier" approach, the *Pike v. Bruce Church, Inc.* balancing test. The inquiry is then whether the state's interest is legitimate and whether the burden on interstate com-

merce clearly exceeds the putative local benefits. This proceeds on the assumption that the measure only indirectly affects interstate commerce and regulates even-handedly. In a sense, it does since South Dakota based utilities operating only intrastate are as much "ham-strung" by Amendment E as non-South Dakota based utilities. As to utilities, interstate pipeline companies, wind power generators with needed interstate transmission lines, interstate railroads, and interstate communication companies, Amendment E clearly places a substantial burden on interstate commerce. It will greatly increase the costs of the described companies doing business in South Dakota as well as in other states where the companies do business. Any new corridors acquired for transmission lines or pipelines or any other industrial purpose cannot be farmed (as has historically been done, usually by the fee owner farmer without cost to the utility) and these companies will thus incur substantial annual additional costs to comply with other laws and to keep weeds under control. Utility rates in South Dakota and elsewhere, including certainly Minnesota, will undoubtedly increase. South Dakota is a prime location for the generation of wind power. Other states need that power.

[¶ 104] This case is akin to *Kassel v. Consolidated Freightways*, 450 U.S. 662, 669, 101 S.Ct. 1309, 1315, 67 L.Ed.2d 580 (1981), where the United States Supreme Court struck down an Iowa law setting truck length limitations which prohibited 65 foot "doubles" from using Iowa highways. If Iowa was allowed to prohibit them, it would affect interstate commerce going from Illinois to Nebraska on Interstate 80. The Supreme Court held that the law substantially burdened interstate commerce because diverting semis around Iowa engendered inefficiency and added expense. *Id.* at 674, 101 S.Ct. at 1318. "[A] State cannot constitutionally promote its own parochial interests by requiring safe vehicles to detour around it." *Id.* at 678, 101 S.Ct. at 1320.

[¶ 105] Similarly, if South Dakota is allowed to prohibit easements for transmission lines, whether for electricity, wind power, water, or natural gas, running through South Dakota to connect two states on either side of South Dakota, causing greatly increased costs to utilities and other companies, interstate commerce would be greatly affected.

[¶ 106] There is no legitimate state interest of any kind in burdening utilities or rate payers or, for that matter, owners of agricultural land, with any of this "utility business." Claims were made that no such effects were even intended. It is undisputed that there is no rationality to the matter of prohibiting these easements. It is, of course, impossible to know what the voters intended. We are, however, left with what the measure says, not what voters or others now wish it might say.

[¶ 107] Performing the required "balancing test", Amendment E violates the dormant Commerce Clause of the United States Constitution. The burdens imposed on interstate commerce are clearly excessive in relation to the putative local benefits. This is true whether the utility provisions are balanced against the putative benefits of Amendment E *in toto* or *vis a vis* the lack of an exemption for utility enterprises.

[¶ 108] Plaintiffs have sought a permanent injunction to prohibit the defendants from enforcing or attempting to enforce Amendment E. This would be an idle act, no enforcement of Amendment E having been attempted at this stage other than the passage of certain rules. State officials and certainly the defendants will follow the terms of any court order and this court should not lightly enjoin state elected officials. Thus, the request for an injunction should be denied.

[¶ 109] The foregoing constitutes the court's findings of fact and conclusions of law.

## ORDER

[¶ 110] Based upon the foregoing,

[¶ 111] IT IS ORDERED:

1. Plaintiffs' request for a declaratory judgment herein is granted.

2. Article XVII, Sections 21 –24, of the South Dakota Constitution are unconstitutional and unenforceable.

3. Plaintiffs' motion for injunctive relief.    is denied.