James W. ELLENBECKER, Secretary, South Dakota Department of Social Services, State of South Dakota Department of Social Services, Plaintiffs,

v.

CENTERS FOR MEDICARE AND MEDICAID SERVICES, Thomas A. Scully in his official capacity as Administrator of the Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services, and Tommy G. Thompson in his official capacity as Secretary of the U.S. Department of Health and Human Services, Defendants.

No. CIV. 02–3042.

United States District Court, D. South Dakota, Central Division.

Sept. 30, 2003.

Fran Kuperman, U.S. Dept Health & Human Svc, Office of General Counsel, Baltimore, MD, Bonnie P. Ulrich, U.S. Attorney's Office, Sioux Falls, for Tommy G. Thompson, Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services, Thomas A. Scully, Defendants.

Charles A. Miller, Covington & Burling, Washington, DC, Anthony Moises Sanchez, Department of Social Services, Pierre, SD, for State of South Dakota Department of Social Services, James W. Ellenbecker, Plaintiffs.

## ORDER

KORNMANN, District Judge.

### INTRODUCTION

This is an administrative appeal from the final agency decision by the Departmental Appeals Board ("DAB") of the United States Department of Health and Human Services ("DHHS"), upholding the Centers for Medicare and Medicaid Services ("CMS") disallowance of certain claims for reimbursement made by the South Dakota Department of Social Services ("DSS") and requiring South Dakota to refund by way of offsets almost $2,700,000. Also in dispute are South Dakota claims of $1,299,690 not allowed by the defendants. Plaintiffs filed a motion for summary judgment prior to the filing of an answer or the administrative record.[1] Defendants did not timely file a responsive brief, despite an extension of time to do so. Defendants subsequently filed a motion for summary judgment but failed to concurrently file a brief in support thereof, as required by DSD L.R. 7.2. Defendants' untimely attempt to file a brief in support of their motion (which brief is also a belated attempt to respond to the plaintiffs'

motion for summary judgment) was denied. Defendants' untimely response to the plaintiffs' statement of facts as well as defendants' statement of facts in support of defendants' motion for summary judgment, and the plaintiffs' response thereto, have been accepted and considered. I reject both the plaintiffs' and defendants' pleas to allow the defendants to circumvent the Federal Rules of Civil Procedure and the Local Rules of the District of South Dakota and now file briefs in support of and in resistance to the pending motions for summary judgment. Contrary to plaintiffs' concerns, the defendants will not be prejudiced as I have reviewed the entire file, including the administrative record, and have conducted my own independent research in order to rule upon the cross motions for summary judgment. All the arguments advanced by defendants are also contained in the administrative record.

### BACKGROUND

The "material" facts are not in dispute. Medicaid is a medical welfare program established in 1965 pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. The program is funded and administered jointly by the federal and state governments. Under Title XIX, each state must designate one state agency to administer a "plan for medical assistance" which plan must be approved by the Secretary as being consistent with Title XIX and the Secretary's regulations. 42 U.S.C. § 1396a. In South Dakota, that agency is DSS.

Medicaid acts, in essence, as an insurer for low income or disabled individuals. When a qualified South Dakota Medicaid recipient receives medical care, the health care provider bills DSS. DSS directly re-

---

1. It is normal practice in this district that, once an answer and administrative record are filed in an administrative appeal, a briefing schedule is entered by the Court. One or more of the attorneys apparently did not know of the "normal practice."

imburses the health care provider for the allowable cost of covered services and then submits quarterly claims to DHHS for federal reimbursement. DHHS reimburses South Dakota for a percentage of the state's Medicaid costs, referred to as the federal medical assistance percentage ("FMAP"). 42 U.S.C. § 1396b(a). The rate of reimbursement, which is calculated yearly for each state based upon per capita income, varies from 50% to 83%. 42 U.S.C. § 1396d(b) (section 1905(b) of the Social Security Act). The rate for South Dakota over the past several years has ranged from 64% to 68%. Pursuant to § 1396b(d), federal payments are made to each state via quarterly advances based upon the state's estimated expenditures, with adjustments made to reflect overpayments or underpayments.

Federally, the Medicaid program is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency within the DHHS. Prior to July 31, 2001, CMS was called the Health Care Financing Administration ("HCFA"). The names are used interchangeably throughout the record. For the sake of consistency (and considering the plethora of abbreviations used herein) all references shall be to CMS even when a particular document or communication was issued by CMS' predecessor.

In 1976, Congress enacted the Indian Health Care Improvement Act ("IHCIA"), PL 94–437, declaring "that it is the policy of this Nation, in fulfillment of its special responsibilities and legal obligation to the American Indian People, to meet the national goal of providing the highest possible health status to Indians and to provide existing Indian health services with all resources necessary to effect that policy." 25 U.S.C. § 1602(a).

The IHCIA added, inter alia, 42 U.S.C. § 1396j:

> A facility of the Indian Health Service (including a hospital, intermediate care facility, or skilled nursing facility), whether operated by such Service or by an Indian tribe or tribal organization (as those terms are defined in section 4 of the Indian Health Care Improvement Act), shall be eligible for reimbursement for medical assistance provided under a State plan if and for so long as it meets all of the conditions and requirements which are applicable generally to such facilities under this title ... The Secretary is authorized to enter into agreements with the appropriate State agency for the purpose of reimbursing such agency for health care and services *provided in Service facilities* to Indians who are eligible for medical assistance under title XIX of the Social Security Act, 42 U.S.C. 1396, as amended.

P.L. 94–437, Title IV, Sec. 402 (emphasis supplied). The IHCIA also amended Section 1905(b) of the Social Security Act, 42 U.S.C. § 1396d(b) (which, as set forth above, defines the FMAP) by adding the following:

> Notwithstanding the first sentence of this section, the Federal medical assistance percentage shall be 100 per centum with respect to amounts expended as medical assistance for *services which are received through an Indian Health Service facility* whether operated by the Indian Health Service or by an Indian tribe or tribal organization (as defined in section 4 of the Indian Health Care Improvement Act).

The phrase "services which are received through an Indian Health Service ['IHS'] facility" is at the heart of the dispute between DSS and DHHS. DSS asserts that it is entitled to the 100% enhanced reimbursement rate for Medicaid costs incurred and paid by the State for eligible Indians who received services provided,

pursuant to a contractual arrangement, at non-IHS facilities pursuant to a "referral" from an IHS facility. DHHS asserts that the regular reimbursement rate (approximately 66%) applies to costs incurred for IHS referred services.

In 1994, Congress adopted the Indian Self–Determination Contract Reform Act of 1994, PL 103–413, Title I, Sec. 101. That Act, in part, amended 25 U.S.C. § 450j(1) to provide:

> Upon the request of an Indian tribe or tribal organization, the Secretary shall enter into a lease with the Indian tribe or tribal organization that holds title to, a leasehold interest in, or a trust interest in, a facility used by an Indian tribe or tribal organization for the administration and delivery of services under this Act.

P.L. 103–413, Title I, Sec. 102.

In response to the above amendment, on December 19, 1996, IHS and CMS entered into a Memorandum of Agreement ("MOA") which provides, in part:

> The purpose of this memorandum of agreement (MOA) is to establish the roles and responsibilities of the [CMS] and the Indian Health Service (IHS) in implementing a change in payment policy for Medicaid services provided on or after July 11, 1996, to American Indian and Alaska Native (AI/AN) individuals *through* health care facilities owned and operated by AI/AN tribes and tribal organizations with funding authorized by Title I or III of the Indian Self–Determination and Education Assistance Act (Public Law 93–638, as amended), hereafter "638."

> The United States Government has a historical and unique legal relationship with, and resulting responsibility to, AI/AN people ... The health care delivery system for AI/AN tribes with this unique government-to-government relationship consists of IHS-owned and op-

erated health care facilities, IHS-owned facilities that are operated by AI/AN tribes or tribal organizations under 638 agreements (contracts, grants, or compacts), and facilities owned and operated by tribes or tribal organizations under such agreements.

> AI/AN individuals are entitled to equal access to state, local, and Federal programs to which other citizens are entitled. Under the provision of its approved medical assistance plan, the state Medicaid agency is responsible for meeting the cost of services provided therein for all individuals, regardless of race or national origin, who apply and are found eligible. Many IHS and tribally owned health care facilities provide such Medicaid services to AI/AN individuals, and states reimburse the facilities accordingly.

> Prior to July 11, 1996, if such services were provided *by* a health care facility operated by the IHS or by a tribe or tribal organization under a 638 agreement, [CMS]'s interpretation of the controlling statute, section 1905(b) of the Social Security Act (the Act), 42 U.S.C. 1396d, provided the state with 100–percent Federal medical assistance percentage (FMAP), or 100–percent Federal reimbursement, only for payments made by the state for services rendered *through* an IHS-owned or leased facility. If such services were provided *through* a tribally owned and operated facility, the state received an FMAP of 100 per centum less the state percentage, which, depending on the state, could range from 50–percent to 83–percent of the amount the state paid the facility.

> A recent amendment to 638 added a new subsection that affects this payment policy. Upon request of a tribe or tribal organization, new section 105(1) requires the Secretary of Health and Human Services, through IHS, to enter into a lease

with a tribe or tribal organization that holds title to or leasehold or trust interest in a facility used by such tribe or tribal organization for administration and delivery of 638 health care services. An IHS lease of any tribally owned facility in which 638 health services are provided would then make the state entitled to the 100–percent FMAP for services provided *through* the facility ... Thus, as, of July 11, 1996, the Secretary approved [CMS]'s proposal to adopt an interpretation that section 1905(b) allows 100–percent FMAP for Medicaid services furnished to Medicaid eligible AI/ANs *by* any tribal facility operating under a 638 agreement ... (emphasis supplied.)

Prior to the announcement of the new policy, 100% FMAP was limited to expenses for services provided by *IHS owned* or *leased* facilities. In essence, the new policy change simply expanded the 100 % FMAP to expenses for services provided by or through *IHS operated* and *638 operated* facilities.

In order to administer the MOA, IHS agreed, among other things, to negotiate with tribes to include state quality care standards in any 638 agreements, prepare a list of facilities which were either IHS operated or facilities operating under a 638 agreement, and to inform the newly included facilities that they needed to provide the necessary information to state Medicaid agencies to enable the state to process claims at the new facilities and to claim reimbursement from the United States.

In order to administer the MOA, CMS agreed, among other things, to:

Revise its payment policy to provide 100–percent FMAP with respect to amounts expended by the state for Medicaid services to eligible AI/ANs *received through* tribally owned facilities operating under a 638 agreement, as identified in the IHS list, A2 above, as well as for Medicaid services *received through* IHS-owned or leased facilities. (emphasis supplied.)

On January 3, 1997, CMS sent a memorandum to state Medicaid directors with the attached MOA between IHS and CMS. The memorandum announced a modification to CMS "policy with regard to reimbursement of Medicaid services provided to Medicaid-eligible American Indian (AI) and Alaskan Native (AN) individuals." The memorandum continues:

The revised policy expands our definition of "a facility of the Indian Health Service" to include tribally owned facilities funded by Title I or III of the Indian Self–Determination and Education Assistance Act (Public Law 93–638), as amended, hereafter referred to as "638." Effective July 11, 1996 (the day Secretary Shalala approved this policy change), claims submitted by IHS for Medicaid services provided to Medicaid-eligible AI/ANs at 638 facilities will be eligible for 100 percent Federal Medical Assistance Payments (FMAP.)

In the near future, IHS will provide [CMS}] with a list of its 638 facilities for which 100 percent FMAP is available. When this list is received, we will forward it to you. Please be advised facilities providing Medicaid services that are not on this list, as well as urban IHS clinics, will continue to be reimbursed by [CMS] at your States's traditional FMAP rate.

Please consult with your Regional Office State Representative if you have questions regarding this revision in policy.

On May 15, 1997, CMS sent another policy memorandum to all state Medicaid directors which memo was ostensibly intended to clarify the MOA. This memorandum was prompted by an inquiry from the State of Arizona as to the FMAP for non-emergency transportation provided to

American Indians. That memorandum provides, in part:

> [N]on-emergency medical transportation is not considered to be an IHS (638) facility service and therefore does not qualify for reimbursement of 100% FMAP ... Our position on this issue is that in order for IHS services to qualify for 100% FMAP, the service must be: (1) provided by IHS, *or a contractual agent of an IHS or tribal facility*, (2) considered as a "facility service"; that is, a service that would be within the proper scope of services which can be claimed by that facility, and (3) claimed by the IHS facility as a service of that facility. These services are referred to in regulation at 42 CFR 440.10 ("Inpatient hospital services") and 42 CFR 440.20 ("Outpatient hospital services and rural health facility services")
>
> For most facilities, services are furnished within the physical confines of the facility. Satellite facilities owned or leased, and operated by IHS or tribal 638 programs, are also considered to be within the physical confines of an IHS/tribal facility. *Referred services,* provided *through a contractual arrangement,* can also be considered *provided "through* an IHS facility" *and reimbursed at the 100% FMAP* rate as long as these are services that could be provided as a "facility service", as referenced by regulation above. Any other type of services, such as non-emergency transportation, are not considered to be "facility services", and therefore should be reimbursed at the normal State/Federal match rate.

(Emphasis supplied.)

According to the plaintiffs:

> Relying on that policy memorandum addressing Indian Health Service ("IHS") "referred services" and on the plain language of the statute, South Dakota commenced a partnership with the IHS—a federal agency within defendant HHS—to develop and implement a system for identifying and claiming 100% reimbursement for IHS referred services provided through contractual arrangements between IHS facilities and non-IHS medical providers. South Dakota brought these claims to the attention of defendant DHS [more correctly, DHHS] in 1998, and CMS examined them again during an on-site review in 1999. CMS's head office was notified independently in 1999 that South Dakota was receiving 100% reimbursement for IHS referred services. It was not until 2001, however, the CMS advised South Dakota that the agency had concluded that *none* of those claims were eligible for 100% reimbursement, and that the reimbursements previously received by the State and expended on the State's Medicaid program should have been calculated at the State's regular Medicaid reimbursement rate of approximately 66%. CMS based its decision on a litigation position that the agency had first articulated just months earlier in a pending administrative proceeding with another State involving the same statute.

Plaintiff's Memorandum, Doc. 10, pp 1–2.

On or about June 27, 2001, CMS sent to the South Dakota Department of Social Services a notice of disallowance in the amount of $3,975,308, this representing claims made by DSS to CMS for the period of October 1, 1998, through December 21, 2000, at the 100% FMAP rate for services that were not provided at an IHS, tribal, or 638 facility. Of the total amount disallowed, $1,299,690 had not yet been reimbursed to DSS. Thus, CMS sought $2,675,618 in repayment by way of an adjustment to DSS's grant award from CMS for the next quarter (presumably the second quarter of 2001). The matter was appealed to the DAB and the DAB issued a final decision holding that Section

1905(b)'s (i.e. 42 U.S.C. § 1396d(b)) reference to services that are "received through" an IHS facility is ambiguous, that the Secretary's interpretation denying 100% FMAP for such services is a reasonable interpretation of the statute, and that South Dakota was on notice of a longstanding federal agency policy prohibiting 100% FMAP for IHS "referred services."

Plaintiffs contend first that the IHCIA unambiguously authorizes 100% FMAP for referred services. Second, even if the IHCIA is ambiguous, this Court need not give deference to the Secretary's interpretation of the IHCIA. Third, that plaintiffs lacked notice of any policy prohibiting 100% FMAP for referred services. Fourth, that plaintiffs detrimentally relied on their own interpretation of the IHCIA. Plaintiffs thus contend that the DAB's decision should be reversed as it relates to the disallowances at issue herein.

### DECISION

Judicial review of the Secretary's final decision is authorized pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 702.

> "Under the APA, the Secretary's decision shall be set aside if it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law." *Hennepin County Med. Ctr. v. Shalala,* 81 F.3d 743, 748 (8th Cir.1996); *see* 5 U.S.C. § 706. "Federal court review is de novo." *Hennepin County Med. Ctr.,* 81 F.3d at 748. "The plain meaning of a statute controls, if there is one, regardless of an agency's interpretation." *Id.* (*citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). "An agency's interpretive rules, which are not subject to APA rulemaking procedures, are nonbinding and do not have the force of law." *Id.*

*In Home Health, Inc. v. Shalala,* 188 F.3d 1043, 1046 (8th Cir.1999).

### I. Interpretation of the IHCIA.

This Court has previously set forth the rules to be applied in interpreting statutes:

> "It is a basic rule of statutory interpretation ... that a statute which is clear and unambiguous on its face is not subject to construction." *Northwest Paper Co. v. Federal Power Commission,* 344 F.2d 47, 50 (8th Cir.1965), (citing *Blair v. City of Chicago,* 201 U.S. 400, 26 S.Ct. 427, 50 L.Ed. 801 (1906); *Kansas City, Missouri v. Federal Pacific Electric Co.,* 310 F.2d 271, 273, 274 (8th Cir.1962), and 2 Sutherland, Statutory Construction, 334 § 4702 (3rd Ed.1943)). "When the language of a statute is clear, certain, and unambiguous, there is no occasion for construction, and the court's only function is to declare the meaning of the statute as clearly expressed in the statute." *American Meat Institute v. Barnett,* 64 F.Supp.2d 906, 915 (D.S.D. 1999), (quoting *South Dakota Subsequent Injury Fund v. Casualty Reciprocal Exchange,* 1999 SD 2, ¶ 17, 589 N.W.2d 206, 209 (1999), (quoting *Delano v. Petteys,* 94 SDO 700, 520 N.W.2d at 608), (quoting in turn *Petition of Famous Brands Inc.,* 347 N.W.2d at 884–85)).

\* \* \* \* \* \*

Canons of statutory construction, when properly applied, are useful tools but are only aids to judicial interpretation which should not be applied when there is no ambiguity. *United States v. Vig,* 167 F.3d 443, 448 (8th Cir.1999).

> Unless exceptional circumstances dictate otherwise, when the terms of a statute are unambiguous, judicial inquiry is complete. *See In re Erickson Partnership,* 856 F.2d 1068, 1070 (8th Cir.1988). "We ask not what the Con-

gress means; we ask only what the statute means." *United States v. Hepp*, 656 F.2d 350, 353 (8th Cir. 1981); *see, e.g., Northern States Power Co. v. United States*, 73 F.3d 764, 766 (8th Cir.1996) (stating that when "statutes are straightforward and clear, legislative history and policy arguments are at best interesting, at worst distracting and misleading, and in neither case authoritative").

*United States v. Vig*, 167 F.3d at 448.

*South Dakota Farm Bureau, Inc. v. Hazeltine*, 2002 D.S.D. 13, ¶ 9, 202 F.Supp.2d 1020, 1026–27.

Neither Title XIX of the Social Security Act nor the Indian Health Care Improvement Act contain any definition of the phrase "services which are received through an [IHS] facility." These statutes do not use the term "referred services." It is clear from a reading of the statutes at issue that, following the enactment of the IHCIA in 1976, IHS facilities located in South Dakota were eligible to seek Medicaid reimbursement from DSS for services provided to eligible Native Americans "in IHS facilities" and South Dakota was authorized to seek reimbursement from DHHS for payments made to such IHS facilities at the 100% FMAP. Following the enactment of the Indian Self–Determination Act Amendments of 1994, the Secretary was authorized to enter into leases of tribally owned health care facilities.

As stated earlier, the language in question is: "services which are received through an Indian Health Service facility." What does it mean to be "received through"? More specifically, are the services "received through" when a referral has been made by the IHS to private health care providers who had previously entered into a contract with the IHS which contracts deal with providing health care to eligible Native Americans, either in a hospital setting or in an outpatient setting?

## II. Construction of the IHCIA.

This Court has held:

The United States Supreme Court has instructed us that:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted). The Supreme Court cautions, however, that:

The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9 (internal citations omitted).

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.

*Id.* at 843–44, 104 S.Ct. at 2782.

*Livestock Marketing Ass'n v. U.S. Dept. of Agriculture*, 2001 DSD 5, § 32, 132 F.Supp.2d 817, 826–27 (D.S.D.2001).

It is clear that in 1998, 1999, 2000, and part of 2001, the defendants were interpreting or not objecting to interpretations that federal law allowed 100% FMAP reimbursement for services provided to Native Americans by non-IHS facilities and providers who had contractual arrangements to do so and where referrals were made by IHS. In other words, if a Native American appeared without a referral and without a contractual arrangement between the facility or provider and IHS, the

regular Medicaid reimbursement rate applied. In 2001, the defendants reversed course and adopted a policy and interpretation in direct conflict with what prevailed previously. The result is that we have two inconsistent policies and two inconsistent interpretations by the federal agencies. To which of the opposite positions should the Court give whatever deference might be due? The DAP was in error in looking at only one of the Secretary's interpretations. The DAP was in error in stating that South Dakota was on notice of a longstanding agency policy prohibiting 100% FMAP for IHS referrals. In truth, the previous agency policy was to the contrary.

On the assumption that the statute is not clear, there would be no need to give deference to the agencies' determination. The policies enunciated in the Secretary's memorandums have never been subject "to the rigors of notice and comment" and, therefore, such determinations would not be entitled to substantial deference. *See King v. Morrison*, 231 F.3d 1094, 1097 (8th Cir.2000) (refusing to defer to an agency program statement). The holding in *King* was cited with approval in *In re Old Fashioned Enterprises, Inc.*, 236 F.3d at 425. *Old Fashioned Enterprises* also cited with approval *United States v. 162 MegaMania Gambling Devices*, 231 F.3d 713, 716 (10th Cir.2000) (court "not obligated to afford [agency's] informal pronouncements the same deference prescribed under *Chevron* ").

The IHCIA was designed to remedy the "deplorable status of Indian health," H.R. Rep. 94–1026(I), 1976 U.S.C.C.A.N. 2652, 2654, by providing scholarships and other programs to increase the number of Indians who enter the health care field, increasing appropriations for staff in facilities serving Indians, providing a plan for the renovation and construction of IHS

facilities [2], providing for the payment of Medicaid and Medicare monies for services provided in IHS facilities to eligible Indians at a FMAP rate of 100%, and authorizing IHS facilities in urban areas. H.R. Rep. 94–1026(III), 1976 U.S.C.C.A.N. 2782. Although Indians had been eligible for Medicaid benefits [3], they were unable to take advantage of such benefits because IHS facilities could not receive reimbursement under Medicaid and non-IHS facilities were inaccessible. H.R. Rep. 94–1026(I), 1976 U.S.C.C.A.N. 2652, 2745. Given the fact that the law and federal policy was and is to provide better health care for Native Americans, that goal can only be met by referrals. Many IHS facilities, unfortunately, are simply not equipped or staffed to provide essential health care. That is especially the case throughout South Dakota. Essential health care includes serious trauma care and any services to be rendered by specialists for cancer care, pulmonary care, eye care, surgery, diabetes, heart care, and virtually all other serious medical needs. In the more than eight years I have been on the bench, I have not seen a serious injury case in which the patient was not transferred to a non-IHS facility. In the absence of such transfers, the patient in almost every case would not survive. The IHS itself has entered into contractual arrangements with non-IHS medical facilities and providers. This comes exactly within the memorandum of May 15, 1997, adopted and "published" by CMS.

■ The Medicaid provisions of the IHCIA have a two-fold purpose: (1) authorize Medicaid payments to IHS facilities to be used to finance the changes needed to bring such facilities into compliance with Medicaid standards, and (2) authorize "100% Federal Medicaid matching funds for services provided to any Indian in an IHS facility" to alleviate the "unfair and inequitable" burden to state Medicaid programs which normally would have been borne by the IHS. *See Id.* at 2746 and H.R. Rep. 94–1026(III), 1976 U.S.C.C.A.N. 2782, 2795. It is true that all three committees to which the IHCIA was referred specifically addressed the claimed limitation that the 100% FMAP was limited to services provided to Indians "in IHS facilities." H.R. Rep. 94–1026(I), 1976 U.S.C.C.A.N. 2652, 2746; H.R. Rep. 94–1026(II), 1976 U.S.C.C.A.N. 2775, 2772; H.R. Rep. 94–1026(III), 1976 U.S.C.C.A.N. 2782, 2796. Of course, Native Americans who qualified for Medicaid were always

---

**2.** The Committee on Interior and Insular Affairs determined that continued use of the facility at Pine Ridge, South Dakota, "should not be planned without correction to the serious fire safety and environmental hazards identified." H.R. Rep. 94–1026(I), 1976 U.S.C.C.A.N. at 2729. The Committee determined that the facility at Rosebud, South Dakota "is so grossly substandard and hazardous that it should be discontinued in use of the earliest possible date ... This building should be razed and replaced." *Id.* at 2729–30.

**3.** Some of the poorest counties in the United States are located wholly within the confines of Indian reservations in this state. It only stands to reason that a large percentage of the Native American population qualifies for Medicaid. Indeed, Congress recognized in the IHCIA that:

> Indian health is imperiled by—inadequate, outdated, inefficient, and undermanned facilities ... shortage of personnel ... insufficient services in such areas as laboratory, hospital inpatient and outpatient, eye care and mental health services, and services available through contracts with private physicians, clinics, and agencies ... related support factors [housing for staff] ... lack of access of Indians to health services due to remote residence, undeveloped or under developed communication and transportation systems, and difficult, sometimes severe, climate conditions; and lack of safe water and sanitary waste disposal services.

25 U.S.C. § 1601(f)(1).

eligible to receive Medicaid funds at non-IHS facilities and South Dakota would have sought federal reimbursement for those services at the same rate as for other citizens receiving services at non-IHS facilities.

I have digressed much in this opinion, primarily to show the vacillations that have occurred. I return to the central and only issue to be decided: did Congress speak unambiguously in the statute? As already discussed, if that is what happened, it makes no difference what the federal agency or the state agency or anyone else thought. It also makes no difference what the legislative history and policy arguments might be. *See United States v. Vig,* 167 F.3d 443, 448 (8th Cir.1999). Other than in cases where exceptional circumstances dictate to the contrary, when the terms of a statute are unambiguous, judicial inquiry is complete. *See In re Erickson Partnership,* 856 F.2d 1068, 1070 (8th Cir.1988).

I find that there are no exceptional circumstances which dictate to the contrary. I find that the terms of the statute are unambiguous and that is the end of the matter. I reject the holding of the DAB and the Secretary that the statute is ambiguous. The language in the IHCIA to the effect that 100% reimbursement is to be provided for "services which are received through an [IHS] facility" is clear and unambiguous, "Through" does not mean "at." It does not mean "by." "Through" means coming in at one end (IHS facility) and passing out of that facility into (a) another IHS facility, or (b) tribal facility, or (c) a non-IHS facility providing in-patient or out-patient care based on a preexisting contract between IHS and the non-IHS facility and based on a referral from the IHS. It also means "in at the first step of a process, treatment, or method of handling, passing through subsequent steps or stages in order ..." *Ran-*

*dom House Unabridged Dictionary* (Second Edition).

DSS is entitled to a summary judgment. There are no genuine issues of any material fact. Both sides claim and concede that such is the case, having both moved for a summary judgment. The motion of the defendants for a summary judgment should be denied. The final decision of the Secretary and the DAB should be reversed.

## ORDER

Based upon the foregoing, it is ordered:

1. Plaintiffs' motion (Doc. 6) for summary judgment is granted, although for only one of the reasons stated therein.

2. Defendants' motion (Doc. 20) for summary judgment is denied.

3. Defendants' motion (Doc. 33) for leave to file a late brief is denied.

4. The final decision of the Secretary and the DAB is reversed.